909 A.2d 1035

James A. THOMPSON

v.

STATE of Maryland.

No. 87, Sept. Term, 2005.

Court of Appeals of Maryland.

Oct. 24, 2006.

George E. Burns, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, Baltimore), on brief, for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

In this case, we are called upon to decide two issues relating to an Order issued by the Circuit Court for Baltimore City granting appellant's petition for postconviction DNA testing pursuant to Md.Code (2001, 2006 Cum.Supp.), § 8–201 of the Criminal Procedure Article.[1] The Order at issue states as follows: [2]

> "It is FURTHER ORDERED that the Maryland Medical Examiner's Office, or the appropriate State agency in possession of the following, shall release a portion of the following forensic samples directly to Reliagene Technologies, Inc., 5525 Mounces Street, Suite 101, New Orleans, LA 70123
>
> "1) Portions of all slides taken from vaginal or rectal swabbings or washings relating to the autopsy of [the victim] conducted on August 3, 1987; and
>
> "2) The 'cut-off blue jeans,' Property number 33870.
>
> "It is FURTHER ORDERED that the Maryland Medical Examiner's Office, or appropriate State agency, retain a sufficient portion of the evidentiary samples for future confirmatory DNA testing;

---

1. Unless otherwise indicated, all subsequent statutory references herein shall be to the Criminal Procedure Article, Md.Code (2001, 2006 Cum. Supp.).

2. This case is before us on a direct appeal pursuant to § 8–201(j)(6), which provides that "[a]n appeal to the Court of Appeals may be taken from an order entered under subsection (c) . . . of this section."

"It is FURTHER ORDERED that Petitioner is precluded from relying on any DNA test results involving any evidence samples of which Reliagene Technologies, Inc. has failed to preserve a sufficient portion thereof for future confirmatory DNA testing; and

"It is FURTHER ORDERED that the Maryland Office of the Public Defender shall pay initially the designated laboratory all reasonable expenses incurred during the testing of the DNA samples."

First, we determine whether the trial court abused its discretion in ordering the retention of samples of the materials to be tested pursuant to the Order sufficient to permit retesting. We shall vacate that portion of the Order and hold that the Circuit Court abused its discretion by ordering such retention without first determining whether it was scientifically feasible given the nature of the samples to be tested under the Order. Second, we decide whether the trial court erred by ordering the results of the testing be precluded from use in further proceedings if samples for retesting are not retained. We shall also vacate the portion of the Order that prohibits the future use of the DNA test results.

## I.

Appellant James A. Thompson was convicted by a jury in the Circuit Court for Baltimore City on October 13, 1988 of first degree felony murder, first degree rape, burglary, and carrying a weapon with intent to injure. He was sentenced to life imprisonment for the first degree murder conviction, and a term of three years incarceration, to be served consecutively for the carrying conviction, with the remaining charges merged for sentencing purposes.

On direct appeal, the Court of Special Appeals affirmed in an unreported opinion. Before that Court, appellant's only argument was that the trial court committed reversible error by admitting into evidence expert testimony that a pubic hair found on the back of the victim matched his pubic hair. Appellant's contention was that the microscopic comparison

method used by the State's expert was less reliable than DNA testing, and that this relative lack of reliability rendered expert testimony based on microscopic comparison inadmissible. The Court of Special Appeals affirmed, concluding that microscopic comparison was generally accepted within the relevant scientific community, and hence expert testimony based upon such a method is admissible under *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978).

In the Circuit Court for Baltimore City, appellant, through counsel, filed a petition for postconviction DNA testing pursuant to § 8–201.[3] The State opposed appellant's petition. In his petition, appellant requested DNA testing of evidence in the possession of the State relating to appellant's conviction. He averred that his counsel had been informed by the Maryland Medical Examiner's Office that it had possession of the cytology slides containing some of this evidence, which consisted of semen taken from vaginal and/or rectal swabs of the victim. Appellant further alleged that identity was an issue in his trial, that DNA testing of the evidence in the possession of the State could determine whether appellant was identified correctly at trial as the perpetrator, and that this evidence had not previously been subject to DNA testing.

On November 8, 2004, the Circuit Court held a hearing on the petition. At the hearing, appellant requested testing of two additional items of evidence: material from a pair of blue jeans owned by appellant that contained a blood stain that matched the blood type of the victim, and the cytology slides containing the pubic hairs taken from appellant for microscopic comparison with the pubic hairs found on the victim at appellant's trial. After requesting and receiving additional briefing from the parties, on August 31, 2005, the Circuit Court denied appellant's petition. In its Order denying the petition, the Circuit Court explained that it was denying the

---

3. His petition, captioned as a "Motion for Release of Evidence to Conduct DNA Analysis," specifically referenced § 8–201 as a basis for the motion, as well as an independent constitutional right to DNA testing. Appellant has not raised this constitutional argument before us, and we therefore do not address it.

petition because appellant had failed to meet his burden under § 8–201(c)(2) to establish that "the requested DNA test employs a method of testing generally accepted within the relevant scientific community."

On September 15, 2005, appellant noted a timely appeal to this Court pursuant to § 8–201(j)(6), and, on the same day, filed a motion for reconsideration in the Circuit Court. On November 17, 2005, the Circuit Court granted appellant's motion for reconsideration, vacated its Order of August 31, 2005, and granted in part appellant's petition for DNA testing.

In its memorandum opinion, the Circuit Court first stated that appellant had now satisfied the Court that his proposed method of testing met the requirements of § 8–201(c)(2). The Circuit Court explained its reasoning for concluding that appellant's request for testing of the semen samples taken from the victim and the blood-stained blue-jeans satisfied the requirements of § 8–201(c)(1),[4] but that appellant's request for testing of his pubic hair comparison sample did not meet these requirements. Notably absent in the Circuit Court's opinion was any discussion of the provisions in its Order requiring retention of samples sufficient for future confirmatory testing, and prohibiting appellant from relying on the results of the testing in future proceedings in the event that sufficient samples for future confirmatory testing are not preserved.

Pursuant to § 8–201(j)(6), appellant noted a timely appeal to this Court.

## II.

We first address the aspect of the Order prohibiting appellant from using the results of the ordered DNA testing if samples sufficiently large to permit confirmatory retesting are not retained. Appellant presents two arguments. First, appel-

---

**4.** Section 8–201(c)(1) requires a court hearing a petition under § 8–201 to find that "a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing" before it orders DNA testing.

lant claims that "[t]here is nothing in § 8–201 that justifies this requirement." Second, appellant argues that, because the State is permitted in criminal cases to present scientific evidence against a criminal defendant based on destructive testing, a petitioner challenging his conviction under § 8–201 should have a similar right to make use of the results of a destructive test to challenge his conviction in a postconviction proceeding. The State replies that the plain language of § 8–201(e) reserves to the discretion of the circuit court the particular conditions of the release of DNA evidence for testing, and that the prohibition on the future use of the test results if there is no retest sample available is nothing more than such a condition.

On the second issue, appellant argues that the court Order that the State agencies in possession of the evidence to be tested retain a sufficient portion of the evidence to permit retesting is unworkable because those agencies do not have the required scientific expertise to determine the size of the sample necessary to permit retesting. The State responds that appellant's contentions concerning the inability of the State agencies to determine how much evidence to retain to permit retesting have not yet been addressed by the Circuit Court, as they were raised for the first time in appellant's December 6, 2005 motion for reconsideration. Consequently, the State argues, there is no basis on this record for this Court to disturb the evidence retention provision in the Circuit Court's Order. Additionally, the State argues that appellant's appeal is not properly before this Court because a party only has a right to appeal an adverse decision of a lower court, and the Circuit Court's Order was not adverse to appellant because it *granted* appellant's petition for DNA testing.

### III.

As a preliminary matter, we dispatch with the State's argument that the appeal is not properly before us. In *Administrator, Motor Vehicle Administration v. Vogt,* 267 Md. 660, 664, 299 A.2d 1, 3 (1973), we observed that "[g]enerally, a party cannot appeal from a judgment or order which is

favorable to him, since he is not thereby aggrieved." *See also Wright v. Baker*, 197 Md. 315, 318, 79 A.2d 159, 161 (1951). This principle, however, does not prevent a party from challenging an aspect of a lower court judgment or order that results in the party receiving less than the full relief it sought below, even though the judgment or order is otherwise in accord with the relief the party requested. *See Mugford v. Mayor and City Council of Baltimore*, 185 Md. 266, 269, 271–72, 44 A.2d 745, 746–47 (1946) (holding that taxpayers who sought to have a contract between Baltimore City and a union declared void, and further sought to enjoin the City from deducting union dues from employee wages and remitting them to the union as provided for in the contract, could challenge on appeal the portion of the trial court's decree that expressly permitted voluntary collection of union dues by the city, despite the fact that the decree declared the contract invalid and otherwise enjoined the city and the union from "carrying out the undertakings of [the] contract").

The Circuit Court's Order, although it ordered the release of the cytology slides and blue jean samples for DNA testing, did not do so unconditionally. The release of these items for testing was conditioned on the retention by the relevant state agencies of samples sufficiently large to permit retesting, and prohibited appellant from using the test results in future proceedings challenging his convictions if this condition was not met. Appellant's petition for DNA testing requested testing of these items *simpliciter*, without mention of a retention condition of the sort imposed on the testing by the Circuit Court. Appellant may challenge on appeal these conditions imposed on the testing.[5]

---

5. This Court has been advised by letter from Thompson's counsel dated September 28, 2006 that Baltimore City Circuit Judge Allison granted a request for testing by Thompson's co-defendant, James Owens, on May 16, 2006. The Order granting the request did not include any of the testing conditions objected to and appealed by Thompson. The Circuit Court's Order in *Thompson* remains in effect and the appeal before this Court has not been dismissed.

## IV.

Turning to the merits, we address first whether the Circuit Court properly ordered retention of samples sufficient for retesting on the record before it. Section 8–201(e), Contents of Order, provides as follows:

"(e) If the court orders DNA testing under subsection (c) of this section, the court in its order may issue orders the court considers appropriate, including designation of any of the following:

(1) the specific evidence to be tested;

(2) the method of testing to be used;

(3) the preservation of some of the sample for replicate testing and analysis;

(4) the laboratory where the testing is to be performed, provided that if the parties cannot agree on a laboratory, the court may approve testing at any laboratory accredited by the American Society of Crime Laboratory Directors (ASCLAD), the Laboratory Accreditation Board (LAB), or the National Forensic Science Technology Center; and

(5) release of biological evidence by a third party."

Because § 8–201(e)(3) expressly permits a court ordering DNA testing under § 8–201 to order "the preservation of some of the sample for replicate testing and analysis," the Circuit Court had the power to enter a retention order. The question, rather, is whether the Circuit Court abused its discretion in ordering retention on the basis of the record before it.

The Circuit Court acted prematurely in ordering retention of samples sufficient for retesting on the record before it. In our view, § 8–201(e), although it provides for the preservation of some of the sample for replicate testing, only permits a circuit court to enter an unconditional preservation order if the court has determined that preservation of some sample for replicate testing and analysis is possible. In this case, there was no basis on the record before the court to

conclude that retention of samples was possible. Section 8–201(c), Findings Requiring DNA Testing, provides as follows:

"(c) Subject to subsection (d) of this section, a court shall order DNA testing if the court finds that:

(1) a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing; and

(2) the requested DNA test employs a method of testing generally accepted within the relevant scientific community."

Subsection (c), by stating that a court "shall order DNA testing" if it makes the findings specified in (c)(1) and (c)(2), manifests a legislative intent in favor of DNA testing of potentially exculpatory physical evidence. The Circuit Court's Order frustrates this intent. Even assuming *arguendo* that the State agencies in possession of the evidence to be tested under the Order possess the requisite scientific expertise to determine whether nondestructive DNA testing of the evidence is possible,[6] the Circuit Court's Order requiring these agencies to retain a sample sufficient for retesting would require the State agencies in possession of the evidence to retain all of the evidence in the event that there was only enough material for a single test. Thus, in the event that the only way the evidence could be subjected to DNA testing is by destructive testing,[7] the Circuit Court's Order would preclude *any* testing of the evidence, contrary to the intent manifested by the plain language of § 8–201(c).

---

**6.** Appellant disputes whether these agencies possess the requisite scientific expertise to make these determinations. As resolution of this question is not necessary to our disposition of the case, and the record before us does not provide an adequate basis to answer this question, we shall not address it.

**7.** By "destructive testing," we mean testing that would destroy the entire sample. We use "destructive testing" interchangeably with "consumptive testing."

Although we rest our holding on the plain language of the statute, our holding is further supported by the primary purposes behind the enactment of § 8–201—to facilitate the establishment of claims of actual innocence for serious crimes. Interpreting § 8–201 to permit a circuit court, once it has made the prerequisite findings under § 8–201(c), to enter a DNA testing order that could have the effect of potentially making DNA testing impossible is, in our view, inconsistent with this purpose, because it could result in the continued incarceration of an actually innocent person whose innocence might be established in the absence of such an order.

Examination of the legislative history of § 8–201 reveals the General Assembly's concern with actual innocence. Section 8–201 was enacted in 2001. *See* 2001 Md. Laws, Chap. 418, S.B. 694.[8] The Revised Fiscal Note for Senate Bill 694 of 2001 observed as follows:

> "The push for postconviction DNA testing gained momentum with the creation of the Innocence Project at Benjamin Cardozo School of Law in New York in 1992. The Innocence Project was founded to help wrongly convicted prison inmates prove their innocence through DNA testing. According to news reports, 76 prisoners nationwide, including eight inmates on death row, have been released from prison because of postconviction DNA testing that has exonerated the person who was convicted."

Furthermore, the General Assembly's rejection of a requirement that DNA testing not have been available at the time of trial supports the view that the legislative intent in enacting § 8–201 was to provide a mechanism for exoneration of the actually innocent. One witness before the Maryland Senate Committee on Judicial Proceedings testified in support of S.B. 694 that such a requirement, which was included in other

---

8. Section 8–201 has been subsequently amended by the General Assembly on several occasions. In the contemporaneously filed companion case of *Blake v. State,* 395 Md. 213, 909 A.2d 1020, 2006 WL 3007324 (2006), we provide more discussion of the legislative history of § 8–201. *Id.* at 217, 909 A.2d at 1022.

DNA testing bills introduced in the General Assembly in 2001, is inconsistent with the goal of ensuring that the actually innocent are exonerated, stating as follows:

"S.B. 15 establishes a threshold requirement for post-conviction DNA testing that 'the technology for such testing was not available to the petitioner at the trial.' S.B. 84 and S.B. 699 contain a variation on that theme—they require that the evidence was not previously tested 'for reasons beyond the control of the petitioner.'

"Both of these formulations create an unjustified hurdle to DNA testing. There are cases in which DNA testing is, in a scientific sense, "available" to a defendant, but he does not obtain DNA testing at that time. . . ."

> \* \* \* \* \* \*

"Any such threshold is an unnecessary 'procedural default' rule—if the defendant missed his opportunity, too bad. But that logic does not explain why the state should continue to incarcerate or even execute an innocent man who failed to obtain testing previously for *whatever* reason." Testimony of Ronald Weich, Counsel to the Justice Project, before the Senate Judicial Proceedings Committee (Feb. 22, 2001). The General Assembly's ultimate rejection of such a requirement provides evidence of its concern with actual innocence.

Our holding should not be misconstrued as disapproving generally of the practice of retention of DNA samples for potential retesting when doing so is feasible. To the contrary, we agree with the view expressed by the Minnesota Supreme Court, and by several commentators, that retention of samples for potential future retesting is advisable when it is possible. *See State v. Traylor*, 656 N.W.2d 885, 898–900 (Minn.2003) (approving of testing policy of State Bureau of Criminal Apprehension which "requires that, when possible, a portion of the evidence sample be retained at the . . . laboratory" and "if a test precludes any further testing, the defense must receive reasonable notice and an opportunity to have a qualified expert observe the test."); DNA Advisory Board Standard 7.2

(providing that "[w]here possible, the laboratory shall retain or return a portion of the evidence sample or extract"); American Bar Association, CRIMINAL JUSTICE STANDARDS ON DNA EVIDENCE, Standard 3.4(a) (approved by the American Bar Association House of Delegates August 7, 2006) (counseling that "[w]hen possible, a portion of the DNA evidence tested and, when possible, a portion of any extract from the DNA evidence should be preserved for further testing"); National Research Council, THE EVALUATION OF FORENSIC DNA EVIDENCE 88 (1996) (recommending that "[w]henever feasible, forensic samples should be divided into two or more parts at the earliest practicable stage and the unused parts retained to permit additional tests"); National Institute of Justice, National Commission on the Future of DNA Evidence, POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS 24, 63 (Sept.1999), *http://www.ncjrs.org/pdffiles1/nij/177626.pdf*, (recommending that samples be split whenever possible before and during the testing process). The rationale for this preference is manifest: the preservation of a sample for retesting provides a means to challenge the reliability of an adverse test result by attempting to replicate the result in a subsequent test in the event there is a dispute as to the adequacy of the testing procedures employed in the initial test.

The desirability of retention of samples for future retesting does not, however, justify the categorical, unconditional, exclusion of the results of destructive testing. The party seeking to challenge an adverse destructive DNA test result is not necessarily left without the means to do so simply because the test was destructive. As we recently observed in *Young v. State*, 388 Md. 99, 879 A.2d 44 (2005), a defendant is able to challenge adverse DNA test results offered by the State in other ways besides confirmatory retesting, stating as follows:

"A defendant is not without recourse when the State's expert identifies the defendant as the source of the DNA evidence. The defendant has the opportunity, and the right, to challenge the expert's conclusion in cross-examination.

*See* Md. Rule 5–703(c) (stating that '[t]his Rule does not limit the right of an opposing party to cross-examine an expert witness or to test the basis of the expert's opinion or inference'). Md.Code (1973, 2002 Repl.Vol., 2004 Cum. Supp.), § 10–915 of the Courts and Judicial Proceedings Article provides additional means for the defendant to challenge the expert's testimony that the defendant was the source of the DNA evidence. Under § 10–915(c), the party seeking to introduce the DNA evidence must, upon written request at least thirty days prior to the proceeding, provide the other party with a 'statement setting forth the genotype data and the profile frequencies for the databases utilized.' § 10–915(c)(2)(v). The defendant may cross-examine the expert on the statistics and the expert's conclusions based on those statistics. Additionally, the defendant can challenge the weight of the DNA evidence, by, for example, questioning the expert about laboratory errors and contamination. *See* § 10–915(c)(2)(i) and (ii) (requiring the party introducing DNA profile evidence, upon timely written request, to produce laboratory results and notes)."

*Id.* at 121, 879 A.2d at 57.

Our observations in *Young* apply with similar force to postconviction DNA testing. Section 8–201(h)(2) requires a court to open or reopen postconviction proceedings in the event of a favorable test result to a § 8–201 petitioner. *See also* Md. Rule 4–401(b) (providing that, in the event of a test result that is favorable to a § 8–201 petitioner, if the petitioner has not previously petitioned for postconviction review, the petition for postconviction DNA review shall be treated as a petition under the Uniform Post Conviction Procedure Act). Once a postconviction proceeding has been initiated under § 7–102 or reopened under § 7–104, the petitioner is entitled to a hearing. § 7–108(a); *see* Md. Rule 4–406(a). At such a hearing, the State would have the opportunity to challenge the conclusions of the postconviction petitioner's DNA expert just as a criminal defendant would have to challenge the conclusions of a DNA expert witness offered by the State at trial. *See* Md. Rule 4–406(c) (evidence at hearing on postconviction

petition under Uniform Post Conviction Act "may be presented by affidavit, deposition, oral testimony, or in any other form as the court finds convenient and just"). Furthermore, under § 8–201(e), a circuit court may, when ordering destructive DNA testing, require in its order that the test be undertaken in such a way that the items enumerated in CJP § 10–915(c)(2)(i)–(v) are preserved so that the State may use them in future postconviction proceedings to challenge the validity of the DNA test results, and may also, when appropriate, order mutual observation or recording of the DNA test itself.

Finally, for guidance on remand, we note that our holding does not leave the Circuit Court without recourse to fashion testing orders that embody a preference for preservation of retesting samples, if doing so is feasible, and that protects the interests of the State in having the ability to challenge the reliability of the testing results in subsequent postconviction proceedings if consumptive testing is the only means of testing available and the results of such testing are favorable to a § 8–201 petitioner.

The issue of the appropriate procedures to follow when destructive testing is necessary was addressed by the American Bar Association Criminal Justice Section's recently approved CRIMINAL JUSTICE STANDARDS ON DNA EVIDENCE. Specifically, Standard 3.4, Consumptive Testing, provides in relevant part as follows:

"(d) Before approving a test that entirely consumes DNA evidence or the extract from it, the attorney for any defendant against whom an accusatorial instrument has been filed, or for any other person who intends to conduct such a test, should provide the prosecutor an opportunity to object and move for an appropriate court order.

"(e) If a motion objecting to consumptive testing is filed, the court should consider ordering procedures that would permit an independent evaluation of the analysis, including but not limited to the presence of an expert representing the moving party during evidence preparation and testing,

and videotaping or photographing the preparation and testing."

Although these provisions address pre-conviction destructive DNA testing specifically, these recommendations should be accorded equal weight with respect to postconviction DNA testing, particularly the recommendations of Standard 3.4(e).

A circuit court entering a testing order under § 8–201 may address the concerns about measures to ensure that the State has an adequate basis to challenge the testing procedures employed in a destructive test. When ordering DNA testing pursuant to § 8–201(c), a circuit court may, consistent with § 8–201(e), order the testing laboratory to retain samples sufficiently large for confirmatory retesting if the testing laboratory determines that this is possible, and, if not possible, require the testing laboratory to refrain from performing the destructive test and to inform the court or the State's Attorney that destructive testing is the only means of testing available. The court may then consider a request from the State to modify its initial testing order to put in place further safeguards in the testing process to ensure that the State has the necessary means to challenge the testing results if it believes that there is some defect in the testing procedure.

## V.

We turn to the second issue: whether it was appropriate for the trial court to order that the results of the testing be precluded from use in further proceedings if samples for retesting are not retained. In light of our holding that the Circuit Court abused its discretion by ordering prematurely the retention of retesting samples, we vacate this provision. This provision presumes that the sample to be tested is large enough to retain a portion of it. As we have indicated, this conclusion is not supported by the record in this case.

In the event that the Circuit Court determines that a retention order is appropriate, we make the following observations for guidance. Although neither § 8–201 nor the Maryland Rules contain any provisions that address expressly the

power of a circuit court to enforce testing orders entered under § 8–201(c), we note that a circuit court has inherent authority to take appropriate steps to enforce a testing order entered under § 8–201(c), and, consequently, to provide for appropriate sanctions for noncompliance with such an order. In *Wynn v. State*, 388 Md. 423, 879 A.2d 1097 (2005), we recently discussed the inherent powers of the courts. There, we noted that "[s]ince the early years of the Republic, Maryland courts have recognized the inherent authority of the courts." *Id.* at 431, 879 A.2d at 1102. Reviewing our prior cases discussing the inherent authority of circuit courts, we concluded that "[t]he concept of inherent authority ... is grounded in the understanding that courts must possess certain powers in order to function as courts." *Id.* at 433, 879 A.2d at 1103. Similarly, the United States Supreme Court, in *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980), observed that "[t]he inherent powers of ... courts are those which 'are necessary to the exercise of all others.' " *Id.* at 764, 100 S.Ct. at 2463 (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812)).

 Courts have inherent judicial power to impose sanctions for violations of court orders. Violation of discovery orders is one example. *See, e.g., Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 293 (5th Cir.1997); *Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 488 (9th Cir.1991); *Buffington v. Baltimore Cty., Md.*, 913 F.2d 113, 132 n. 15 (4th Cir.1990). Furthermore, many courts have recognized that the inherent power of a court to impose sanctions is not limited to civil discovery, but extends to criminal discovery as well. *See, e.g., Taliaferro v. State*, 295 Md. 376, 390, 456 A.2d 29, 37 (1983) (holding that trial court had power to exclude alibi evidence as a sanction for the defendant's failure to disclose this evidence in accordance with a discovery rule, despite the fact that the discovery rule applicable at the time did not expressly provide for a sanction of exclusion), *cert. denied*, 461 U.S. 948, 103 S.Ct. 2114, 77 L.Ed.2d 1307 (1983); *State v. Guthrie*, 631 N.W.2d 190, 195 (S.D.2001) (holding that "a trial court has the inherent power to fashion an appropriate

sanction for discovery violations in criminal cases"); *State v. Blenden*, 748 So.2d 77, 88–89 (Miss.1999); *State v. Clemente*, 166 Conn. 501, 353 A.2d 723, 729 (1974); *People v. Pearson*, 210 Ill.App.3d 1079, 155 Ill.Dec. 723, 569 N.E.2d 1334, 1338 (2 Dist.1991). Courts also have supervisory power to exclude evidence under certain circumstances. *See, e.g., Crane v. Dunn*, 382 Md. 83, 100, 854 A.2d 1180, 1190 (2004) (observing that Md. Rule 5–403 "codifies the inherent powers of trial judges to exercise discretion to exclude relevant, probative evidence that is unduly prejudicial, confusing, or time-consuming"); *United States v. Colomb*, 419 F.3d 292, 299–300 (5th Cir.2005). By analogy, then, we conclude that a circuit court has inherent power, in the proper case, to sanction a violation of a valid DNA testing order entered under § 8–201(c).

 A circuit court's power to impose such sanctions, however, is not boundless. The ruling of the Circuit Court in the case *sub judice* is the equivalent of the creation of an exclusionary rule because it categorically precludes the use of the test result in advance of an actual violation of the retention provision in the court's DNA testing Order. In the absence of statute or a rule promulgated by this Court, the Circuit Court does not have the inherent power to create an exclusionary rule of evidence under a statute that itself does not have an exclusionary rule.[9] *See Wynn*, 388 Md. at 443–44, 879 A.2d at 1109 (holding that the inherent authority of a court to control its docket did not empower a circuit court to impose dismissal

---

9. Although the State contends that the Circuit Court had statutory authority under § 8–201(e) to fashion an exclusionary rule for a violation of an order requiring retention of samples for retesting, we are not persuaded. The State argues that the creation of such a rule is sanctioned by § 8–201(e) because it falls under the class of "orders the court considers appropriate" that a circuit court may order when ordering DNA testing under § 8–201. We interpret this language, however, only to permit a circuit court to enter further orders pertaining to the DNA testing process. The purpose clause of 2003 Md. Laws, Chap. 240, which added this language to § 8–201(e), states that the purpose of the Act was to "authoriz[e] a court to make certain orders regarding DNA testing when it orders DNA testing." *Id. See also Stevens v. Rite–Aid*, 340 Md. 555, 568 n. 16, 667 A.2d 642, 648 n. 16 (1995) (inferring legislative intent from purpose clause).

of charges as a sanction against the State for its violation of a scheduling order); *United States v. Payner*, 447 U.S. 727, 735, 100 S.Ct. 2439, 2446, 65 L.Ed.2d 468 (1980) (holding that the supervisory power of courts does not permit lower federal courts to fashion an exclusionary rule to exclude evidence illegally seized from a third party); *State v. Jackson*, 570 A.2d 1115, 1117 (R.I.1990) (per curiam). The court in *Jackson* stated as follows:

"A fortiori a Federal District Court has no power to create an exclusionary rule based upon a Rhode Island statute that in itself provides no such exclusionary rule. This court in the exercise of its constitutional supervisory power over all trial courts undoubtedly has such power. However, as the United States Supreme Court points out in *Payner*, this power should be exercised with great restraint after balancing carefully the societal interests involved. We believe that an exclusionary rule is strong medicine indeed since it deprives the trier of fact in many instances of highly relevant and reliable evidence. We believe that the General Assembly of Rhode Island is quite capable of establishing an exclusionary rule when it desires to do so. The statute under consideration here does not create an exclusionary rule but provides for a fine of $100. We decline to exercise our supervisory function to create an exclusionary rule where the Legislature has seen fit not to do so."

*Id.* at 1117 (internal citations omitted). We agree with *Jackson* that trial courts do not have inherent powers to fashion exclusionary rules.

▮ That a circuit court may not create an exclusionary rule to sanction a violation of a DNA testing order entered pursuant to § 8–201(c) is not to say that a circuit court is powerless to impose a sanction for such a violation. We note, however, that preclusion of the use of the DNA test results is an extreme and drastic sanction under this statute. Applied to a postconviction DNA testing petition, a sanction of exclusion of the results of DNA testing in future proceedings is tantamount to a sanction of dismissal, since the *raison d'etre* of such a petition is to obtain such testing results for use in

future proceedings. It is well-settled that the sanction of dismissal should be used sparingly, if at all. *See, e.g., United States v. $8,221,877.16 in U.S. Currency,* 330 F.3d 141, 161 (3d Cir.2003) ("[T]he sanction of dismissal is disfavored absent the most egregious circumstances."); *United States v. O'Keefe,* 825 F.2d 314, 318 (11th Cir.1987) ("[D]ismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized." (internal quotations omitted)). Thus, a circuit court hearing a postconviction DNA testing petition should impose a sanction of exclusion only in the most extreme cases, and in no case should it impose such a sanction in advance of an actual violation of an order.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.*