976 A.2d 999

**Donte William GREGG**

v.

**STATE of Maryland.**

**No. 21 Sept. Term 2008.**

Court of Appeals of Maryland.

July 24, 2009.

700

George E. Burns, Jr., Asst. Public Defender (Nancy S. Forster, Public Defender, of Baltimore), on brief, for appellant.

Robert Taylor, Jr., Asst. Atty. Gen., (Douglas F. Gansler, Atty. Gen., of Maryland, of Baltimore), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BARBERA, J.

In 2001, the Maryland General Assembly enacted the DNA Postconviction statute. The statute is codified at Maryland Code (2001, 2008 Repl.Vol.), § 8–201 of the Criminal Procedure Article and, as amended several times in the ensuing years, has consistently provided persons convicted of serious crimes to pursue DNA testing of physical evidence, in the possession of the State, that might prove exculpatory or mitigating and result in a new trial or sentencing.[1]

Appellant Donte Gregg was convicted in 2003 of first degree murder. He sought relief under § 8–201 by filing a petition for DNA testing of epithelial cells that were collected on the murder weapon's trigger during investigation of the crime. The circuit court judge who had presided over Appellant's trial denied the petition without a hearing.

Appellant argues that the Circuit Court erred in denying the petition for DNA testing, and, moreover, doing so without a hearing. For the reasons that follow, we agree with Appellant that the court erred by summarily denying the petition. Moreover, because the record that has developed in this case plainly shows Appellant's entitlement to the relief he seeks, we

---

1. Unless otherwise indicated, all subsequent statutory references herein are to § 8–201 as amended in 2003.

shall vacate the Circuit Court's order denying the petition and remand the case with the direction that the court order the requested DNA testing be done.

## I.

Appellant was convicted of firing a single shot, during the early morning hours of June 15, 2002, that fatally wounded Phillip Adams. The only witness to the shooting was Anthony King, who at that time was selling drugs for Adams and was intoxicated from heroin and cocaine. From his position 30 to 40 yards away, King saw a man hold a gun to Adams's head and heard him twice ask Adams to "give it up." Adams replied that he had nothing, and the man shot him. The shooter then got into the passenger seat of a van about ten feet away and said to the driver, "drive or I'll shoot you, too." King was unable to see the driver. The van left the scene.

The police soon located the van being driven in an area near the crime scene. As the police followed, the van stopped and two occupants alighted. Shortly thereafter, police stopped and arrested Appellant. According to the police, Appellant had been the passenger in the van.

Police searched the van and found a .45 caliber shell on the passenger seat and blood, later determined to be Adams's, spattered across the back bumper and back door of the van. Police also found a .45 caliber handgun in the passenger side wheel axle area, beneath a removable storage compartment. Registration forms in the van identified Appellant as the owner. Ballistics test established that the gun retrieved from the van was the murder weapon. Shortly after Appellant arrived at the police station, the police dabbed his hands for the purpose of detecting gunshot residue. The State's expert witness testified that testing of the material removed from Appellant's hands produced evidence of gunshot residue in an amount consistent with his having fired a gun. The witness agreed with defense counsel, however, that the number of particles taken from Appellant's hands did not prove that he had fired a gun. The witness explained that particles could

have been transferred to Appellant's hands if they were adjacent to a gun when it was fired, or if he touched a surface with gunshot residue on it.

Latent fingerprints of comparison value were retrieved from the gun, the storage surface area where the gun was found in the van, a cup on the passenger side of the van, and the interior of the vehicle's passenger area. None of the prints matched those of Appellant.

Swabbing of the murder weapon produced epithelial cells on its trigger. The parties have since disputed whether the defense was informed during discovery of the existence of the epithelial cells. The parties do not dispute, however, that neither the State nor the defense had a DNA analysis of the cells performed before or during trial.

The State's eyewitness to the shooting, King, testified that he had never seen Appellant before trial. He also testified that Appellant's physical appearance did not match the physical appearance of the shooter.

Appellant testified that, on the night in question, he was the driver of the van, not the passenger, and he had nothing to do with the crime. He acknowledged having driven a man by the name of Andre Robinson to the area where the shooting took place, explaining that Robinson had asked to be taken to his girlfriend's home. Appellant testified that he saw Robinson shoot Adams, whom he, Appellant, did not know. Robinson then ran to the van, pointed the gun at him, and told him to drive.

Appellant testified that he grabbed the barrel of the gun when Robinson pointed it at him and pushed it away. Appellant started driving and Robinson went into the back of the van. Robinson then told Appellant to pull over and he did. He and Robinson got out of the van and walked away from it. Sometime thereafter, the police arrested Appellant and took him into custody.

Andre Robinson, though subpoenaed by the defense, failed to appear in court. Defense counsel proffered that, although

he knew from Robinson's attorney that Robinson would invoke his Fifth Amendment privilege, the defense simply wished the jury to assess Robinson's physical appearance. It was not until the jury had begun deliberating that Robinson was located in the courthouse. The court denied Appellant's request to allow the jury to view Robinson at that time. The court, however, ordered that Robinson be held in the courthouse in case the jury asked about him. The jury did not ask about Robinson before rendering the verdict.

The jury found Appellant guilty of first degree murder, conspiracy to commit murder, and use of a handgun in the commission of a felony, and acquitted him of attempted robbery. The court sentenced Appellant to concurrent life sentences for murder and conspiracy and a concurrent twenty-year sentence on the handgun conviction.

The Court of Special Appeals affirmed the judgments in an unreported opinion filed on October 25, 2004.

### Appellant's post-trial efforts to obtain DNA testing

On or about September 18, 2003, while the direct appeal was pending, Appellant filed a "Petition for DNA Evidence—Post Conviction Review," pursuant to § 8–201.[2] The petition was prepared by Appellant's trial counsel. Appellant represented in the petition that, "during the course of the trial the state produced evidence that the murder weapon contained[,] on the trigger, cells that were capable of comparison through DNA analysis." Appellant recounted his version of the events surrounding the crime and summarized what had occurred at trial concerning Robinson. Appellant argued that DNA evidence analysis of the epithelial cells found on the trigger of the murder weapon would show that he had not fired it and therefore would exonerate him of the charges. Under those

---

2. Section 8–201(b) states that the procedure provided by the statute is available to persons convicted of the following crimes: first and second degree murder, manslaughter, rape in the first and second degrees, and sexual offense in the first and second degrees. Appellant, as a person convicted of first degree murder, has standing to file the petition.

circumstances, Appellant asserted, he was entitled to the requested court-ordered DNA testing.

The State responded in opposition to the petition. The State argued that Appellant had not carried his burden of showing entitlement to the DNA testing of the evidence, under the then-extant version of § 8–201(c). That version of the statute required a petitioner to establish, among other facts, that the lack of prior DNA testing was "for reasons beyond the control of the petitioner." The State asserted that it had disclosed to the defense well before trial that swabbings of the trigger area of the murder weapon "were positive for the presence of epithelial cells and same were examined." The State argued that Appellant could have sought to have the cells subjected to DNA analysis before trial. The State further argued that "no amount of analysis of the cells will determine *who* fired the weapon"; rather, the most that could be ascertained from the analysis would be "who may have come into contact with the weapon over the course of time." (Emphasis in original).

The Circuit Court did not rule on the merits of the September 2003 petition. Instead, the court, at the behest of Appellant, dismissed the petition without prejudice in November 2005.

Also in November 2005, Appellant filed, through counsel, a "Motion for New Trial and for Release of Evidence for Forensic Testing," which we hereafter shall refer to as the 2005 petition or, simply, the petition. Appellant served a copy of the petition on the State.

Appellant relied in the petition on § 8–201(c), which had undergone significant amendment since the filing of the original petition in September 2003, in seeking a court order directing the State to release the epithelial cell evidence for DNA testing. Appellant also relied on Maryland Rule 4–331, which provides for the relief of a new trial on the basis of newly discovered evidence, in seeking an order for DNA testing of the epithelial cells and for comparison of the latent fingerprints lifted from the van to those of Andre Robinson.

Appellant recounted in the 2005 petition much of the evidence that was developed at trial. And he asserted, as he had done in the 2003 petition, that "[d]uring the course of the trial defense counsel realized for the first time that biological evidence in the form of epithelial cells recovered from the trigger of the gun had been recovered by a crime lab technician." Appellant noted that the epithelial cells were amenable for DNA testing but had not been tested. Appellant argued that the DNA and fingerprint evidence

> has the potential to corroborate [his] version of what occurred on June 15, 2002 by establishing that Andre Robinson was in the passenger area of the vehicle, handled the murder weapon and pulled the trigger. Taken in conjunction with the testimony of the State's only eyewitness to the crime that the shooter had threatened to shoot the operator of the van if he didn't drive off with the shooter, forensic evidence linking Robinson to the van and the murder weapon certainly has enormous potential to support the defense of [Appellant] that he was not guilty of murder or of conspiracy to murder the victim in this case.

Appellant requested a hearing on the petition.

The State did not answer the petition. The petition was directed to the circuit court judge who presided over Appellant's trial. The court did not direct the State to respond to the petition, nor did the court hold a hearing. In an order docketed on April 17, 2006, the court denied Appellant's request for DNA testing, for release of the fingerprint evidence, and for a new trial. Appellant did not timely receive notice of the court's order.

Upon learning of the order, Appellant filed, on May 2, 2006, a motion for reconsideration of the order and requested a hearing. On the same day, Appellant filed a notice of appeal from the denial of the petition, pursuant to § 8–201(j)(6).[3]

---

3. Subsection (j)(6) was added to § 8–201 in 2003 and provides: "An appeal to the court of appeals may be taken from an order entered under subsection (c), (h)(2), or (j)(4) of this section."

The Court of Special Appeals subsequently dismissed the appeal as untimely.

Meanwhile, the State answered in opposition to the motion for reconsideration. The circuit court did not hold a hearing on the motion; instead, it issued an order denying the motion for reconsideration.

Appellant thereafter filed a petition for postconviction seeking the relief of the right to file a belated appeal from the court's denial of the petition. The court granted that relief by order dated March 20, 2008. This appeal timely followed.

Appellant presents the following question: "Did the trial court err in ruling without affording Appellant a hearing and err in denying Appellant's request for DNA testing?"

## II.

Before getting to the issues in this appeal that implicate § 8–201, we dispose of a preliminary matter. The appeal is brought from the court's denial of the November 2005 "Motion for Release of Evidence for Forensic Testing and for New Trial." Appellant sought DNA testing under both § 8–201 and Maryland Rule 4–331.[4] The State argues that, unlike the court's denial of Appellant's requested relief under § 8–201, which is subject to direct review by this Court, the court's denial of relief under Rule 4–331 can reach us only by issuance of a writ of certiorari.

Appellant, at oral argument before us, agreed with the State. So do we. *See* Md. Rule 8–301(a). We therefore shall confine our review to whether the court properly denied the petition seeking relief under § 8–201.

---

4. We have mentioned that Appellant also sought the opportunity to examine latent fingerprint impressions recovered from the surfaces of the van and the weapon and to compare those impressions to the fingerprints of Andre Robinson. Appellant does not challenge in this appeal the court's denial of that requested relief.

## III.

The parties' arguments focus on § 8–201 and include a disagreement about which version of subsection (c) controls Appellant's case—the version of the subsection that was in effect at the time Appellant was convicted and filed the 2003 petition, or the version currently in effect. The arguments are best understood by a preliminary overview of the statute.

Section 8–201 became law by Chapter 418 of the Acts of 2001. Although § 8–201 has been amended several times in the ensuing years, much of the original version of the law remains essentially intact.[5]

Section 8–201(a), the definitions subsection, from the outset has included a definition of the term, "scientific identification evidence." As of 2003, such evidence is defined in (a)(5) as evidence that:

(i) is related to an investigation or prosecution that resulted in a judgment of conviction;

(ii) is in the actual or constructive possession of a law enforcement agency or agent of a law enforcement agency; and

(iii) contains biological evidence from which DNA may be recovered that may produce exculpatory or mitigating evidence relevant to a claim of a convicted person of wrongful conviction or sentencing if subject to DNA testing.

Subsection (b) has provided from the outset that, "[n]otwithstanding any other law governing postconviction relief," per-

---

**5.** The General Assembly has amended § 8–201 on four occasions since its enactment in 2001. *See* Chapter 465 of the Acts of 2002; Chapter 240 of the Acts of 2003; Chapter 25 of the Acts of 2004; Chapter 337 of the Acts of 2008. The amendments predating the 2008 changes were summarized by Judge Raker, writing for the Court in *Thompson v. State*, 395 Md. 240, 252 n. 8, 909 A.2d 1035, 1043 n. 8 (2006), and *Blake v. State*, 395 Md. 213, 226–27 n. 10, 909 A.2d 1020, 1027–28 n. 10 (2006). The 2008 amendments to § 8–201 had an effective date of January 1, 2009, and, among other changes, re-lettered the subsections so that what was subsection (c) in the versions of the law we will be discussing is now subsection (d).

sons convicted of certain enumerated crimes "may file a petition for DNA testing of scientific identification evidence that the State possesses as provided in subsection (i) of this section and that is related to the judgment of conviction."

Before its amendment in 2003 subsection (c) provided:

*Findings requiring DNA testing.*—Subject to subsection (d) of this section, a court shall order DNA testing if the court finds that:

(1)(i) the scientific identification evidence was not previously subjected to the DNA testing that is requested for reasons beyond the control of the petitioner; or

(ii) the type of DNA test being requested is different from tests previously conducted and would have a reasonable likelihood of providing a more probative result than tests previously conducted;

(2) the scientific identification evidence was secured as provided in subsection (i) of this section, in relation to the crime for which the petitioner was convicted;

(3) the scientific identification evidence to be tested has been subject to a chain of custody as provided under subsection (i) of this section that is sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect;

(4) identity was an issue in the trial that resulted in the petitioner's conviction;

(5) a reasonable probability exists that the DNA testing has the scientific potential to produce results materially relevant to the petitioner's assertion of innocence; and

(6) the requested DNA test employs a method of testing generally accepted within the relevant scientific community.

Under this subsection, so long as findings (1) through (6) are made, and subject to subsection (d), the court must order the requested DNA testing ("the court *shall* order DNA testing") (emphasis added).

Subsection (d) from the beginning has required the petitioner to notify the State of the petition, in writing, and has provided the State an opportunity to respond.

Subsection (e) has been modified somewhat over the years. As originally enacted, it provided that, if the court ordered DNA testing under subsection (c), the court must identify the specific evidence to be tested and the method of testing to be used, and select the laboratory where the testing should be performed. As of 2003, the court may, but need not, issue such orders.

Subsection (f) has provided from the outset that the testing be done as soon as practicable and gives the court the power to order testing to be completed by a certain date.

Subsection (g) has always required the petitioner to pay for the court-ordered DNA testing. If the results are favorable to the petitioner, however, the court "shall order" the State to reimburse the petitioner for the costs of the testing.

Subsection (h) directs the court's actions following the results of the DNA testing. As originally enacted, it provided:

*Disposition upon receipt of results.*—(1) If the results of the postconviction DNA testing are unfavorable to the petitioner, the court shall dismiss the petition.

(2) If the results of the postconviction DNA testing are favorable to the petitioner, the court shall:

(i) if no postconviction proceeding has been previously initiated by the petitioner under § 7–102 of this article, open a postconviction proceeding under § 7–102 of this article; or

(ii) if a postconviction proceeding has been previously initiated by the petitioner under § 7–102 of this article, reopen a postconviction proceeding under § 7–104 of this article.[6]

---

**6.** Effective January 1, 2009, former subsection (h) has been re-lettered as subsection (i) and now allows the court to order a new trial, "on a finding that a substantial possibility exists that the petitioner would not have been convicted if the DNA testing results had been known or

Subsection (i) addressed preservation of scientific identification evidence and the State's obligation to make such evidence available. Subsection (j) as originally enacted addressed the circumstances under which the State could dispose of such evidence.[7]

In 2003, the General Assembly amended § 8–201(c), and made other changes to the statute not pertinent here. Effective October 1, 2003, subsection (c) was amended to provide:

Subject to subsection (d) of this section, a court shall order DNA testing if the court finds that:

(1) a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing; and

(2) the requested DNA test employs a method of testing generally accepted within the relevant scientific community.

*See* Chapter 240 of the Acts of 2003.

The 2003 amendment significantly changed subsection (c). The amendment deleted the finding required by former subsection (c)(1), along with the findings required by former subsections (c)(2), (3), and (4). As a consequence of the deletion of former (c)(1), a petitioner is no longer burdened with establishing that the scientific identification evidence sought to be tested "was not previously subjected to the DNA testing that is requested for reasons beyond [his or her] control."

The 2003 amendment also relaxed the standard the petitioner must meet to establish entitlement to testing: whereas former subsection (c)(5) required the petitioner to show that "a reasonable probability exists that the DNA testing has the scientific potential to produce results materially relevant to

---

introduced at trial[.]" *See* § 8–201(i)(2)(iii). Also as of January 1, 2009, a petitioner may move for a new trial on the same showing as set forth in (i)(2)(iii). *See* § 8–201(c).

**7.** As noted, *supra* note 3, subsection (j) was amended in 2003 and, among other changes, (j)(6) was added.

the petitioner's assertion of innocence," the amended subsection (c) requires the petitioner to demonstrate a reasonable probability "that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing[.]"[8] The 2003 amendment to subsection (c) did not amend the directive that "the court shall order DNA testing," so long as the required findings of that subsection are made (and the petitioner has complied with the notice requirement of subsection (d)).

Notwithstanding that, as of January 1, 2009, what was subsection (c) has been re-lettered, we shall refer in this opinion to that subsection and other subsections of § 8–201 as they were lettered at the times relevant to this appeal.

### IV.

Appellant mounts two arguments in support of his challenge to the court's denial of his request for DNA testing of the epithelial cells on the trigger area of the murder weapon.

We have examined the bill files of both S.B. 363 and H.B. 575, and found nothing in either file that informs the legislative purpose behind the amendment to § 8–201(c). He argues that he satisfied the standard set forth in the version of § 8–201(c) that went into effect on October 1, 2003. Appellant argues that, because he satisfied that standard, the court was required to order the testing, and its refusal to do so was legal error. Appellant separately argues that the court erred by denying the requested relief without a hearing.

The State responds that Appellant incorrectly relies on the 2003 version of § 8–201(c). The State argues that, because

---

8. The 2003 amended language of § 8–201(c) first appeared that year in a bill that was introduced in the House, H.B. 575. Although the language was not in the originally submitted version of S.B. 363 (the bill that ultimately became law) the language amending subsection (c) was added to S.B. 363 by the House. That amendment and others were adopted in Conference Committee, as were the amendments made to H.B. 575, to conform that bill to S.B. 363. The General Assembly passed both bills. As mentioned, the Governor signed S.B. 363 into law. The Governor vetoed H.B. 575, as duplicative.

Appellant was convicted and filed his first petition for DNA testing before the effective date of the 2003 amendment, the original version of subsection (c), in particular, (c)(1), controls the case. Under that version, the State argues, the court properly denied the petition because Appellant was unable to show that the epithelial cell evidence was not previously tested for reasons beyond his control. The State asserts that Appellant "knew of the evidence well prior to trial and had every opportunity to have it tested[,]" and he "made the tactical choice to forego testing of the evidence." The State contends that Appellant, by failing to pursue testing before trial, "has waived the right to demand such testing now."

The State advances a separate waiver argument that § 8–201 is limited by the procedural default provisions of the Uniform Postconviction Procedure Act, Md.Code (2001, 2008 Repl.Vol.), § § 7–101–7–301 of the Criminal Procedure Article (hereinafter "UPPA"). The State asserts that the two postconviction statutes must be read in conjunction. The State directs us, first, to § 8–201(h)(2), which provides: "If the results of the postconviction DNA testing are favorable to the petitioner, the court shall" either open or reopen a postconviction proceeding under the relevant provisions of the UPPA. *See* § § 7–102, 7–104. The State then points out that, under the UPPA, an allegation not raised before or at trial is waived. *See* § 7–106(b).

The State also argues, albeit cursorily, that the equitable doctrine of laches bars Appellant from now seeking DNA testing of the epithelial cells found on the trigger area of the murder weapon. Citing *Ross v. State Bd. of Elections,* 387 Md. 649, 670, 876 A.2d 692, 704 (2005), for the proposition that laches requires "both an inexcusable delay and prejudice to Respondents," the State argues: "There is no reason for the DNA testing issue to arise now, when it could have been resolved before trial. The State is prejudiced by the delay. The petition should not be heard."

Finally, the State contends that the court could properly have concluded that there was no reasonable probability that,

had the DNA testing proven favorable to Appellant, the outcome of his trial would have been different. In that regard, the State asserts: "The State produced an overwhelming amount of evidence of Gregg's guilt," and "[t]he State did not claim, in its case in chief, that the epithelial swabs belonged to Gregg."

The State does not address whether Appellant was entitled to a hearing on the petition before the Circuit Court ruled on it.

## V.

■ We first determine which version of § 8–201(c) controls our review of the court's denial of the 2005 petition for DNA testing. Is it the version of § 8–201(c) in effect when Appellant was convicted and filed the first petition for DNA testing in September 2003, as the State maintains? Or, as Appellant argues, is this case controlled by the version of subsection (c) that went into effect on October 1, 2003?

Preliminarily, to the extent that the State argues that the September 2003 petition for DNA is relevant to the issue, we reject the argument. The court dismissed the September 2003 petition without prejudice, at Appellant's request. Consequently, it is of no effect insofar as the November 2005 petition is concerned. We disagree with the State, moreover, that the version of § 8–201 in effect at the time of Appellant's conviction controls the disposition of the November 2005 petition.

■ Statutes are presumed to operate prospectively; consequently, absent manifest legislative intent to the contrary, statutes may not be given retrospective or retroactive application. *See Langston v. Riffe*, 359 Md. 396, 406, 754 A.2d 389, 394 (2000). There are, however, exceptions to the presumption that legislation is to be applied prospectively. "One such category of exceptions concerns legislative enactments that apply to procedural changes." *Id.* at 406–07, 754 A.2d at 394; *accord Mason v. State*, 309 Md. 215, 219–220, 522 A.2d 1344, 1346 (1987) (stating that "a statute effecting a change in

procedure only, and not in substantive rights, ordinarily applies to all actions whether accrued, pending or future, unless a contrary intention is expressed").

■ Legislative enactments that have remedial effect and do not impair vested rights also are given retrospective application. *Langston*, 359 Md. at 408, 754 A.2d at 395. " 'Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries.' " *Id.* (quoting 3 Norman J. Singer, *Sutherland's Statutory Construction* § 60.02, at 151 (5th ed.1993)).

Section 8–201, like the UPPA, is procedural in nature. *Cf. Mason*, 309 Md. at 220, 522 A.2d at 1346 (stating that the UPPA "is procedural in nature").[9] Section 8–201 is also a remedial statute, as its purpose is to provide a remedy for persons convicted of serious crimes of which they are actually innocent. *See Thompson v. State*, 395 Md. 240, 252, 909 A.2d 1035, 1043 (2006). The 2003 amendment to subsection (c) is likewise both procedural and remedial. The amendment prescribes the standard by which the court assesses a petitioner's entitlement to postconviction DNA testing and it improves the existing remedy by making it easier for qualifying petitioners to establish entitlement to such testing. The General Assembly, moreover, did not express an intent to have the 2003

---

9. Even if a statute is procedural in nature, an amendment to it that unfairly interferes with substantive rights will not be given retrospective application. *See Mason*, 309 Md. at 221-22, 522 A.2d at 1346 (observing that "[p]rospectivity [of an amendment] is generally favored because of the potential for unfair interference with substantive rights that retroactive application may engender," and holding that the 1986 amendment to the UPPA, reducing to two the number of post conviction petitions that a petitioner can file, is to be given prospective application); *see also State v. Williamson*, 408 Md. 269, 277, 969 A.2d 300, 304-05 (2009) (holding, in a case involving a UPPA petition filed by a person convicted of murder in 1968, that the 1995 amendment to the UPPA imposing a ten-year limitations period on the filing of postconviction petitions "has absolutely no application to individuals sentenced before October 1, 1995," and cautioning the State that, should it wish to argue on remand that the petitioner is held to the one-petition limit enacted in 1995, "any retrospective analysis must include potential *ex post facto* consideration").

amendment to § 8–201(c) apply only to persons convicted on or after its effective date.

We hold that the 2003 amendment to § 8–201(c) is to be given retrospective effect. Consequently, Appellant (who, in any case, filed the present petition for DNA testing in November 2005) is entitled to have his petition considered by reference to the version of subsection (c) that went into effect on October 1, 2003. Appellant is not burdened by the previous requirement in the law that he demonstrate that the evidence was not earlier tested "for reasons beyond the control of the petitioner." We therefore reject the State's argument that Appellant has waived his right under § 8–201 to seek testing of the epithelial cells, because the argument rests on an inapplicable version of § 8–201(c).

 We also reject the State's other arguments that Appellant is procedurally barred from obtaining the DNA testing he seeks. We first consider the State's assertion that § 8–201 should be read in conjunction with the UPPA, such that the procedural default provisions of the latter statute foreclose Appellant from having the merits of the petition heard at this juncture. For several reasons, we reject that assertion. It is undermined by the express language of § 8–201(b), which provides that, "[n]otwithstanding any other law governing postconviction relief, a person who is convicted of [certain enumerated crimes] may file a petition for DNA testing." Moreover, the State's assertion requires a reading of § 8–201 that renders nugatory the 2003 amendment that deletes the procedural default language of former subsection (c)(1). It is a basic rule of statutory construction that we do not interpret legislative acts to have been done for nonsensical reasons, nor do we construe statutory language in a manner that renders a portion of the law nugatory or superfluous. *See Blake*, 395 Md. at 224, 909 A.2d at 1026.

 Appellant's petition is not barred by laches, either. Putting aside whether that equitable doctrine might apply in a given case (a matter about which we offer no comment), it certainly does not apply here. Appellant was convicted in the

Spring of 2003. He filed his first petition for DNA testing in September 2003, while his direct appeal was pending. The 2003 petition was eventually dismissed without prejudice in November 2005, and, in the same month, he filed the present petition. The State had the opportunity to respond to both petitions. In short, nothing about this case suggests that laches bars Appellant from having the present petition considered on its merits.

## VI.

Section 8–201 does not mandate a hearing on a petition brought under § 8–201. *Blake*, 395 Md. at 224, 909 A.2d at 1026. Appellant nevertheless argues that the court erred in not granting him the hearing he requested, before ruling on the petition. No case directly answers the question of whether the court should have granted the requested hearing, but two of our prior decisions inform the analysis.

*Blake, supra,* involved the efforts of the appellant, Blake, who was convicted in 1982 of first degree rape and a first degree sexual offense, to obtain DNA testing of forensic evidence that had been collected from the victim. In 2004, he filed a petition for such testing under § 8–201(c). The State filed a motion to dismiss the petition, stating that the evidence had been destroyed. *Id.* at 217, 909 A.2d at 1022. The Circuit Court summarily dismissed the petition before Blake had a chance to respond to the State's motion. *Id.*

Blake appealed. He argued, among other issues, that the court erred in dismissing the petition without an adequate factual record from which to conclude that the State no longer possessed the evidence he sought to have tested, and the court further erred in not holding a hearing to resolve the factual dispute over the existence of the evidence. *Id.* at 217–18, 909 A.2d at 1022. We held that "the Circuit Court erred in dismissing the petition without, at a minimum, giving [Blake] an opportunity to respond to the State's allegation that the DNA testing evidence was no longer in its possession." *Id.* at 222, 228, 909 A.2d at 1025, 1028. We reasoned that, notwithstanding that § 8–201 "is silent with respect to hearings upon

718

the filing of a petition requesting DNA testing," *id.* at 224, 909 A.2d at 1026, the evidence preservation provisions of the statute, the Maryland Rules that address notice and an opportunity to be heard, and due process considerations all support the proposition that Blake was entitled to an opportunity to respond to the State's motion to dismiss the petition, *id.* at 228–230, 909 A.2d at 1029–30. "Having held that the Circuit Court erred by failing to give [Blake] an opportunity to respond to the State's motion to dismiss the petition, we [did] not reach the issue of whether, and if so under what circumstances, a § 8–201 petitioner is entitled to an oral hearing." *Id.* at 229 n. 12, 909 A.2d at 1029 n. 12.

In *Arey v. State*, 400 Md. 491, 929 A.2d 501 (2007), we again addressed whether a circuit court should hold a hearing when the State asserts that DNA evidence no longer exists. In that case, the State submitted an affidavit claiming it no longer had in its possession the evidence that Arey, in a petition filed under § 8–201, sought to have tested. *Id.* at 499, 929 A.2d at 506. The Circuit Court denied the petition, ruling that Arey failed to produce evidence that the State still had possession of the evidence. *Id.* at 500, 929 A.2d at 506. We held that the court erred in denying the petition based on the State's affidavit. We reasoned that the State had the burden of showing that it no longer had the evidence, and the affidavit submitted did not show that the State made a reasonable search for the evidence. *Id.* at 503–04, 929 A.2d at 508–09. Addressing petitioner's claim that he was entitled to a hearing, we concluded that,

given the purpose underlying the statute, which is to provide a means for incarcerated persons to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing, and notwithstanding that § 8–201 is silent on the issue of hearings, if the court determines that there is a *genuine* factual dispute as to whether the evidence exists, ordinarily the court should hold a hearing.

*Id.* at 507, 929 A.2d at 510 (emphasis in original).

We held that Arey was entitled to a hearing on the petition, at which the State would have to establish that the evidence

he sought to have tested was no longer in existence. *Id.* at 504–07, 929 A.2d at 509–10.

## VII.

Against this backdrop, we now address the question Appellant presents, which is in two parts: "Did the trial court err in ruling without affording Appellant a hearing and err in denying Appellant's request for DNA testing?" We shall address the second part of that question first. For the reasons that follow, we conclude that the Circuit Court erred in denying the petition.

Preliminarily, Appellant, as a person convicted of first degree murder, qualifies to seek the relief that § 8–201 provides, and, as he was required to do, he gave written notice to the State of the filing of the petition. *See* § 8–201(b) and (d). Indeed, the State has never argued the contrary.

Further, the 2005 petition makes out a *prima facie* case of Appellant's entitlement to the DNA testing he seeks. We held in Part V. of this opinion that the operative version of § 8–201(c) is the version in effect as of October 1, 2003. That version of subsection (c) directs that the court "shall order the testing" if it makes two findings: first, that "a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing;" and second, that "the requested DNA test employs a method of testing generally accepted within the relevant scientific community." *See* § 8–201(c)(1), (2). The language of the subsection makes clear that, if the court finds that the petition satisfies the requirements of § 8–201(c)(1) and (2), the court has no discretion to deny it summarily.

The 2005 petition alleged sufficient specific facts to satisfy the requirement of § 8–201(c)(1) that "a reasonable probability exists that the DNA testing [of the epithelial cells] has the scientific potential to produce exculpatory or mitigating evidence relevant to [Appellant's] claim of wrongful conviction[.]" The petition laid out most of the evidence that was presented

at trial; asserted that the epithelial cells were amenable for DNA testing, but had not been tested; and argued that DNA evidence "has the potential to corroborate [Appellant's] version of what occurred on June 15, 2002 by establishing that Andre Robinson was in the passenger area of the vehicle, handled the murder weapon and pulled the trigger." The petition also included the argument that,

> [t]aken in conjunction with the testimony of the State's only eyewitness to the crime that the shooter had threatened to shoot the operator of the van if he didn't drive off with the shooter, forensic evidence linking Robinson to the van and the murder weapon certainly has enormous potential to support the defense of [Appellant] that he was not guilty of murder or of conspiracy to murder the victim in this case.

 Given that the statute only requires a showing that the desired testing has a reasonable probability that the DNA testing of the epithelial cells has the scientific potential to produce relevant exculpatory or mitigating evidence, the petition, on its face, satisfies that standard. Appellant was not required to show that the outcome of his case necessarily would have been different, had the jury been presented with the evidence he seeks to obtain through the requested DNA testing. That is why the State's argument on appeal, that the evidence at trial "overwhelmingly" established Appellant's guilt, does not defeat the *prima facie* case the petition makes for satisfaction of the requirement set forth in § 8–201(c)(1).

The petition also alleged that, "if the State is ordered to release the evidence for testing the defense will perform an STR [short tandem repeat] DNA test that is widely used and accepted in the forensic community and routinely admitted as evidence in trials of this state." This allegation satisfies the requirement of § 8–201(c)(2) that the requested DNA test "employs a method of testing generally accepted within the relevant scientific community,"[10] and the State does not argue the contrary.

---

10. STR testing is considered "the most widely used testing in the field of molecular biology," and importantly, "it is the most commonly used

Because the petition made out a *prima facie* case of entitlement to DNA testing of the epithelial cells on the trigger of the murder weapon, the court erred in summarily denying the petition. Consequently, we do not need to answer the first part of Appellant's question presented, which is whether the court was required to hold a hearing before issuing that ruling.

We shall vacate the order denying the petition. We are left, then, to determine what should occur next. At this point, there is nothing in the record suggesting the need for further proceedings. The State has had the opportunity on more than one occasion to argue to the Circuit Court why Appellant is not entitled to DNA testing he seeks. The record contains the State's answer in opposition to the 2003 petition and the State's answer in opposition to the motion for reconsideration of the court's denial of the 2005 petition. Neither document even hints at a potential factual dispute that necessitates resolution at an evidentiary hearing. Moreover, all of the legal arguments the State made in opposition to the court's granting Appellant the relief he seeks either are no longer relevant or have been rejected in this opinion. Finally, there is no indication in the record of any other impediment to the grant of the petition. We therefore remand the case for the court to enter an order directing that the epithelial cells collected from the trigger area of the murder weapon be tested in accordance with the dictates of § 8–201.

**ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED; CASE REMANDED TO THAT COURT WITH THE DIRECTION TO ISSUE AN ORDER CONSIS-**

DNA testing in the criminal justice system." Catherine Arcabascio, *Chimeras: Double the DNA–Double the Fun for Crime Scene Investigators, Prosecutors, and Defense Attorneys?*, 40 Akron L.Rev. 435, 449 (2007) (citing to *U.S. Dep't Just., Off. of Just. Programs, Nat'l Inst. of Just., Post–Conviction DNA Testing: Recommendations for Handling Requests* 27 (1999)). *See also District Attorney's Office for the Third Judicial Dist. v. Osborne*, —— U.S. ——, 129 S.Ct. 2308, 2327, 174 L.Ed.2d 38 (2009) (Alito, J., concurring) (commenting that STR " 'DNA tests can, in certain circumstances, establish to a virtual certainty whether a given individual did or did not commit a particular crime' " (quoting *Harvey v. Horan*, 285 F.3d 298, 305 (4th Cir.2002))).

TENT WITH THIS OPINION. COSTS TO BE PAID BY
THE MAYOR AND CITY COUNCIL OF BALTIMORE.