985 A.2d 540

**Tyrone HORTON**

v.

**STATE of Maryland.**

**No. 114, Sept. Term, 2007.**

Court of Appeals of Maryland.

Dec. 21, 2009.

Thomas J. Cosgrove (Covington & Burling LLP, Washington, DC, of counsel, Seth A. Tucker, Elizabeth J. Averill, Covington & Burling LLP, Washington, DC), on brief, for Appellant.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen.), on brief, for Appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, JOHN C. ELDRIDGE, (Retired, Specially Assigned) and DALE R. CATHELL, (Retired, Specially Assigned), JJ.

ELDRIDGE, J.

This is an action under Maryland Code (2001, 2008 Repl. Vol.), § 8–201 of the Criminal Procedure Article, which grants a right to a person, who had been convicted of one or more specified serious crimes, to file in court "a petition for DNA testing of scientific identification evidence that the State possesses . . . and that is related to the judgment of conviction." § 8–201(b) of the Criminal Procedure Article.[1] The present case was instituted in October 2006 when the petitioner-appellant, Tyrone Horton, filed a petition under § 8–201 for DNA testing of evidence related to his conviction in 1983 of

---

1. In this opinion, all references to Maryland statutory provisions are to § 8–201 of the Criminal Procedure Article of the Maryland Code unless a different statutory provision is specified.

first degree rape and other crimes. The Circuit Court for Montgomery County denied the petition on the ground that the State did not possess DNA evidence related to Horton's 1983 convictions. For reasons set forth in this opinion, we shall reverse the Circuit Court's order denying the petition.

## I.

Section 8–201 of the Criminal Procedure Article has been reviewed and applied by this Court in several recent opinions. *See Gregg v. State,* 409 Md. 698, 976 A.2d 999 (2009); *Arey v. State,* 400 Md. 491, 929 A.2d 501 (2007); *Thompson v. State,* 395 Md. 240, 909 A.2d 1035 (2006), and *Blake v. State,* 395 Md. 213, 909 A.2d 1020 (2006). Nevertheless, before setting out the relevant facts of this case, we shall again briefly review § 8–201 and this Court's opinions applying the statute.

The current Maryland Code contains two complete versions of § 8–201. The first version was enacted by Ch. 418 of the Acts of 2001, and it was in effect from 2001 until January 1, 2009. The second version, enacted by Ch. 337 of the Acts of 2008, temporarily replaced the first version. It became effective January 1, 2009, and will remain in effect through December 31, 2013, at which time it "shall be abrogated and of no further force and effect." Ch. 337 of the Acts of 2008, § 4, 2008 Laws of Maryland at 3254. Not only are there different complete versions of § 8–201, but the version in effect from 2001 until January 1, 2009, was amended on several occasions. For a detailed account of these changes in § 8–201, *see* Judge Barbera's opinion for the Court in *Gregg v. State, supra,* 409 Md. at 708–712, 976 A.2d at 1004–1007, and Judge Raker's opinions for the Court in *Thompson v. State, supra,* 395 Md. at 250–253, 257, 909 A.2d at 1041–1043, 1045–1046, and *Blake v. State, supra,* 395 Md. at 222–228, 909 A.2d at 1025–1029.

Under this Court's holding in *Gregg v. State, supra,* 409 Md. 698, 976 A.2d 999, the provisions of § 8–201 that were in effect on October 18, 2006, when Horton filed his petition for DNA testing, govern the present case.[2] References to

---

**2.** *See also Owens–Illinois v. Zenobia,* 325 Md. 420, 470, 601 A.2d 633, 657–658 (1992) (Where a change in the law affects judicial procedure,

4

§ 8–201 in this opinion will be to the statutory provisions in effect on October 18, 2006.

As previously pointed out, § 8–201 grants to persons convicted of certain crimes a right to file a petition for DNA testing of scientific evidence related to the conviction. Subsections 8–201(b) and 8–201(c) provide as follows:

"(b) *Filing of petition.*—Notwithstanding any other law governing postconviction relief, a person who is convicted of a violation of § 2–201, § 2–204, § 2–207, or §§ 3–303 through 3–306 of the Criminal Law Article may file a petition for DNA testing of scientific identification evidence that the State possesses as provided in subsection (i) of this section and that is related to the judgment of conviction.

"(c) *Findings requiring DNA testing.*—Subject to subsection (d) of this section, a court shall order DNA testing if the court finds that:

(1) a reasonable probability exists that the DNA testing has the scientific potential to produce exculpatory or mitigating evidence relevant to a claim of wrongful conviction or sentencing; and

(2) the requested DNA test employs a method of testing generally accepted within the relevant scientific community."

Pursuant to subsection (e) of § 8–201, a court may issue orders as "the court considers appropriate," including the "release of biological evidence by a third party." "If the results of the DNA testing are favorable to the petitioner, the court shall" open or reopen a postconviction proceeding. § 8–201(h)(2).

---

rather than the cause of action, the change ordinarily applies to court proceedings occurring after the change, even though the cause of action accrued before the change); *Jones v. State,* 302 Md. 153, 161, 486 A.2d 184, 189 (1985)(A change affecting trial procedure was applicable to trials taking place after the change); *Williams v. State,* 292 Md. 201, 219–220, 438 A.2d 1301, 1310 (1981)(same); *Lewis v. State,* 285 Md. 705, 716, 404 A.2d 1073, 1079 (1979) (same).

Subsection (i) provides, *inter alia*, that the "State shall preserve scientific identification evidence that ... the State has reason to know contains DNA material" and that "is secured in connection with an offense described in subsection (b) of this section." Subsection (i) further provides that the "State shall make the scientific identification evidence available to parties in the case under" mutually agreed terms. If an agreement cannot be reached, "the party requesting the testing may file an application in the circuit court that entered the judgment," and the court is authorized to enter an order making the evidence available for testing. Subsection (j) allows the State to "dispose of scientific identification evidence" before the expiration of the incarcerated person's sentence if the State notifies the incarcerated individual, his attorney, and the Office of the Public Defender, and no objection is timely filed. Subsection (j)(6) provides that an appeal from an order entered under § 8–201 shall be taken directly to the Court of Appeals.

Recent cases in this Court have dealt with the efforts which are required from the State in order to demonstrate that evidence requested for DNA testing is no longer available. Initially in *Blake v. State, supra*, 395 Md. at 223, 909 A.2d at 1026, the Court pointed out that § 8–201,

"as drafted, presumes that the evidence a petitioner requests to be tested in fact exists, and does not, on its face, contemplate circumstances where the evidence has been destroyed before the adoption of the statute, or where there is a factual dispute over the existence of DNA testing evidence."

The *Blake* opinion, 395 Md. at 223, 909 A.2d at 1025, recognized that

"[n]one of [§ 8–201's] subsections address expressly the procedures which must be followed when the State represents that the evidence no longer exists, or where there is a factual dispute over the existence of evidence a petitioner seeks to have tested."

**6.** 

In the absence of such statutory guidance, the *Blake* opinion considered a report entitled *Post–Conviction DNA Testing: Recommendations for Handling Requests,* prepared by the National Institute of Justice, National Commission on the Future of DNA Evidence (referred to as the NIJ Report) (http://www.ncjrs.gov/pdffiles1/nij/177626.pdf). The report indicated that " '[m]any times all parties believe that the evidence has been destroyed, when in fact it has not' " (*Blake* 395 Md. at 221, 909 A.2d at 1024). The Court in *Blake* quoted and highlighted the following admonition in the report (395 Md. at 221, 909 A.2d at 1024, emphasis in original):

> " 'If, from initial contact with the investigating officer or review of case files, it appears that evidence suitable for DNA analysis was never collected, or has since been destroyed, it may prove impossible to continue.... However, *no final decision or notification should be made until it has been carefully verified that evidence did not or does not still exist.*' "

The *Blake* opinion went on to hold, *inter alia,* that the State has the burden of establishing that DNA evidence no longer exists (395 Md. at 227, 232, 909 A.2d at 1028, 1031) and that "the State should make an extensive search for the evidence" (395 Md. at 232, 909 A.2d at 1031). Judge Raker for the Court in *Blake* explained (395 Md. at 232–233, 909 A.2d at 1031–1032):

> "Simply asking a police officer to check an evidence unit locker is not sufficient. There are many other likely places where the evidence may have been stored. The [NIJ] report urges prosecutors to search for evidence in non-traditional sources, and to '[c]onsider the possibility of testing items not traditionally thought to contain DNA evidence, such as slides taken by medical personnel during sexual assault examinations and paraffin-imbedded tissue samples taken at the time of an autopsy.' *Id.* The Report cautions prosecutors against concluding too hastily that evidence that an inmate has asked to be tested no longer exists. *Id.* (noting that 'no final decision or notification should be made

until it has been carefully verified that evidence did not or does not still exist')."

Subsequently, in *Arey v. State, supra,* 400 Md. at 502, 929 A.2d at 508, the Court repeated that "the State had the burden of establishing that [the evidence] no longer existed." [3] In *Arey,* the State responded to Arey's § 8-201 petition by filing a signed affidavit of a police sergeant who swore that he had searched the Baltimore Police Department's Evidence Control Unit's database and forms on file and found no reference to the evidence requested by the petitioner. As a result, the police sergeant concluded that "the requested evidence no longer exists." Although the Circuit Court dismissed the petition based on the police affidavit, this Court held that "[s]earching the ECU [Evidence Control Unit] alone was insufficient." 400 Md. at 503, 929 A.2d at 508. We reiterated the holding of the earlier opinion in *Blake* that an appropriate search should include certain most likely places, including police evidence or property rooms, the prosecutor's office, state and local crime laboratories, hospitals, defense investigators, courthouse property rooms, offices of defense counsel, independent crime laboratories, clerks of court and court reporters. This Court particularly noted that Arey, in his petition, suggested another possible location for the requested evidence, namely the trial judge's chambers, where the trial transcript showed that the evidence had been stored and where exonerating DNA evidence was found in an earlier well known capital case involving a defendant named Kirk Bloodsworth. *See Bloodsworth v. State,* 307 Md. 164, 512 A.2d 1056 (1986), and *Bloodsworth v. State,* 76 Md.App. 23, 543 A.2d 382, *cert. denied,* 313 Md. 688, 548 A.2d 128 (1988) (Both cases were decided before the exonerating DNA evidence was found in the trial judge's chambers).

The Court in *Arey* held that "a court should not conclude that evidence no longer exists until the State performs a reasonable search for the requested evidence." 400 Md. at

---

3. To the same effect, *see Gregg v. State,* 409 Md. 698, 718, 976 A.2d 999, 1010 (2009).

8

504, 929 A.2d at 508. *Arey* determined that, in order to constitute a reasonable search, "[t]he State should identify the protocol that was in place [for the destruction of evidence] from the time of the trial to the time of the request for testing, if possible, and see if that protocol was followed." 400 Md. at 503, 929 A.2d at 508. The Court held (*Arey,* 400 Md. at 503–504, 929 A.2d at 508):

> "The evidence in this case had been tested by a laboratory; slides possibly had been made. We have no idea as to the protocol the police or the custodian of evidence utilized at the time the evidence purportedly was destroyed. Because the State was the custodian of the evidence, the State needs to check any place the evidence could reasonably be found, unless there is a written record that the evidence had been destroyed in accordance with then existing protocol."

Stating that " 'the manner of [the evidence's] destruction would not be within the knowledge of an inmate,' " the *Arey* opinion pointed out that a reasonable search by the State for the evidence requested by Arey would have required "the State ... to determine the proper protocol for handling and destroying evidence in Baltimore City in 1974" when Arey's trial took place. 400 Md. at 504–505, 929 A.2d at 508–509. If the State had searched for such protocol, this Court foresaw that "the State might have discovered other locations to search for the requested evidence or determined more conclusively its fate." 400 Md. at 504, 929 A.2d at 508. At a minimum, the Court stated that the search should have included the judge's chambers because the petitioner had demonstrated from trial transcripts that the evidence at one time had been stored there.

## II.

Turning to the present case, on July 8, 1983, the petitioner Tyrone Horton was convicted of first degree rape, assault with intent to maim, and burglary. During the investigation of the crimes, the police had collected numerous pieces of physical evidence from both the victim's examination at Suburban

Hospital and the victim's home. From Suburban Hospital, the police had obtained the Hospital's Evidence Collection Kit, sometimes referred to as a "Rape Kit." The police also had obtained from the hospital a hospital gown, beige underwear, a blue sweatshirt and a green shirt. From the victim's home, the police had collected blood and hair samples from the carpet and the couch. The medical examiner's report indicated that the Hospital's Evidence Collection Kit contained the victim's vaginal and endocervical swabs and slides, an anal swab, hair samples, fingernail scrapings, along with blood, saliva, and semen samples. Although no DNA testing was performed on the semen or blood samples, a forensic examiner testified during Horton's trial that she had performed a blood typing test on some of the blood found at the scene. The examiner determined that the samples were consistent with blood group A, which is the blood group of both Horton and the victim.

On September 13, 1983, after being found guilty of the charges, Horton was sentenced to life imprisonment for rape, with concurrent ten year sentences for aggravated assault and burglary. The judgment was affirmed by the Court of Special Appeals, and Horton's petition for a writ of certiorari was denied by this Court. *Horton v. State*, 301 Md. 176, 482 A.2d 501 (1984). On April 5, 2000, the Circuit Court for Montgomery County denied Horton's petition for relief under the Maryland Postconviction Procedure Act, Maryland Code (2001, 2008 Repl.Vol.), § 7–101 *et seq.*

Horton's petition for DNA testing was filed in the Circuit Court for Montgomery County on October 18, 2006, pursuant to § 8–201. Horton requested that the Circuit Court order Suburban Hospital to produce any physical evidence related to the victim. According to Horton's petition, a student volunteer working with the Innocence Project, a group which seeks to exonerate wrongly incarcerated individuals with the use of DNA evidence, spoke with an employee of Suburban Hospital in 2003 who informed the student that "the Hospital likely would have done a Pap smear on [the victim], and that a copy of the slide taken from this test would have been kept in the

Hospital's files.... [and] that the Hospital's policy was to save any slides with human tissue on them for a period of 25 years." Although the group attempted to obtain this evidence from Suburban Hospital, the Hospital's attorneys declined to hand over such information, citing patient confidentiality. Horton's petition requested an order requiring Suburban Hospital to turn over any physical evidence related to the crime.

The State responded to the petition with an affidavit from Suburban Hospital's medical director, stating that Suburban Hospital does not retain cytology slides for more than 10 years and that "Suburban Hospital does not currently have in its possession any genetic material or slides in connection with a rape kit and examination done on [the victim]." The State also attached a copy of the Hospital's "Laboratory Administrative Procedure" regarding "Retention of Laboratory Records and Materials," which supported the statements of the medical director. The State requested that the Circuit Court deny Horton's petition.

Horton's reply argued that the Hospital's affidavit was insufficient under the standards established in *Blake v. State*, *supra*, 395 Md. 213, 909 A.2d 1020, because it failed to indicate the laboratory's retention policy at the time the victim was examined by the hospital. The reply also pointed out that the State had failed to describe the steps taken by the Hospital to locate the requested records.

Attempts to discover evidence related to the petition lasted over several months. The petitioner Horton attempted to depose several individuals working for Suburban Hospital and requested that the Hospital produce numerous documents related to Horton's trial and convictions. Horton also requested documents related to the Hospital's policies regarding the retention of tissue samples, slides, and other physical evidence. The Hospital objected to petitioner's requests, citing privacy concerns and the federal Health Insurance Portability and Accountability Act. The Hospital refused to participate in the depositions; instead the Hospital filed a motion to quash Horton's subpoenas.

On May 22, 2007, the Circuit Court ordered that Suburban Hospital designate a corporate representative to be deposed. The order stated that the deposition was to last no longer than two hours and should address issues raised by Horton concerning the collection and storage of physical materials and the search made for those materials. The deposition was conducted on June 8, 2007, with the Hospital's representative, who was the Administrative Director of the Laboratory.

During the deposition questioning, the Hospital's representative stated that he had "searched for the physical material" related to the victim but had been unable to locate such material. When petitioner's counsel inquired about the retention policies for evidence collected during 1982, when the crimes occurred, the Hospital's representative admitted that he was unaware of those policies. The representative also responded that he did not have firsthand information regarding the collection of physical materials, and specifically, regarding the hospital's policy of storage and disposal of tissue samples during the time the victim was tested there. The Hospital's attorney stated:

"[W]e don't have a record of [the victim] in the hospital from September 20, 1982. There's no medical record of her ever being treated here. So there's no way to find out where that sample is or if she was here, where that sample was taken from, to provide you with anyone that could tell you about the collection, because we don't know where it would have been collected from."

It should be noted that later in August 2007, a former Administrative Director of the Hospital Laboratory stated that evidence related to the victim might be located in the microbiology department of the Hospital.

Subsequently, the Circuit Court held a hearing on June 18, 2007, to consider the matter of a continuance. Shortly before the hearing, petitioner's counsel had requested that the State search for physical evidence collected from the victim. At the June 18th hearing, the State agreed to undertake such a search, stating that the search would take 45 days. In light of

the petitioner's request and the State's representations, the court granted a continuance.

On August 29, 2007, the State filed its response to the petitioner's request for a search of physical evidence related to the case and in the State's possession. The State's response included the affidavits of Karolyn Tontarski, a former forensic scientist with the Forensic Biology Unit of the Montgomery County Crime Laboratory, and Arthur Hanopole, a supply technician in the Central Property/Evidence Unit of the Montgomery County Police Department. Both individuals outlined the efforts made by their respective departments to find the requested physical evidence, and both acknowledged that, despite their best efforts, no physical evidence from petitioner's case had been found. Nevertheless, the two affiants did find documentary evidence related to the petitioner's criminal case. Ms. Tontarski recovered "a copy of a notice from the Central Property Unit of the Montgomery County Police Department reflecting that, as of March 17, 1986, the evidence that the Central Property Unit maintained in the Horton case had been approved for destruction."

Mr. Hanopole discovered an entry on a database entitled "Closed 2: Table," which indicated that there was a "Form 526" related to Horton's case in the Central Property Unit of the police headquarters. Mr. Hanopole's affidavit explained that the "Form 526" is a form which showed that evidence was received by the Central Property/Evidence Unit. Mr. Hanopole's affidavit stated: "It is my understanding that the 526 forms that were reviewed . . . and recorded in the Closed 2: Table database were for cases in which the evidence had been destroyed."

The State's written response to the court also included the assertion that, in a conversation between the current Evidence/Property Manager of the Montgomery County Police Department and the officer who had signed the form found by Ms. Tontarski, "it was the practice at the time . . . to authorize destruction of evidence [maintained by the Central Property Unit] in a non-capital case once the direct appeal process in a

case was concluded." Horton's criminal case had been concluded with the denial by this Court of his petition for a writ of certiorari on October 22, 1984. The "Form 526" is dated March 17, 1986.

Additionally, the State's counsel noted that he had searched for evidence in the petitioner's case in both the file of the State's Attorney's Office and the Montgomery County Circuit Court's file, but that he did not find any physical evidence in those locations. The Montgomery County Circuit Court's file did contain letters from the Clerk of that court addressed to both the State's Attorney and defense counsel in Horton's trial. Those letters, dated December 3, 1984, stated that the physical evidence introduced at Horton's trial was available for release and, if the evidence was not picked up, it would be disposed of "in such a manner as may be appropriate."

In a supplemental response filed on September 24, 2007, the State supplied a copy of the actual "Form 526" in Horton's case. This form is titled "Receipt for Property," and states that there were two boxes, three bags, shoes and clothes included in the evidence received by "Central Property" on December 22, 1982. The Form contains a stamp which reads "Case Closed." Nothing on the face of "Form 526," however, indicates that the evidence was destroyed.

At the final Circuit Court hearing on September 26, 2007, the State requested that Horton's petition be dismissed. Horton's counsel opposed dismissal, arguing that counsel had not had the opportunity to depose or interview the State's affiants regarding the alleged destruction of the evidence.[4] Petitioner's counsel also argued that the search for evidence at Suburban Hospital had not been fully concluded because the microbiology department, which might have screened the victim's samples for sexually-transmitted diseases, had not been searched. Counsel represented that he had requested an interview with someone in the microbiology department at

---

4. The attorney for the State, at the September 26, 2007, hearing, took the position that, in an action under § 8–201, "depositions were not appropriate."

Suburban Hospital, but the Hospital had not granted his request. Finally, Horton's counsel pointed out that the Hospital had been unable to locate the victim's medical records, and that the State had been unwilling to disclose the victim's social security number in order to assist the Hospital in such a search.

The Circuit Court decided in favor of the State, pointing out that Horton had

"no information that you can give me that would suggest that you have any good faith basis to believe that there is any evidence there that could be examined for purposes of recovering DNA. You simply want to conduct, continue conducting your investigation on the off-chance that maybe there is something there and maybe further investigation would reveal that something, if that something existed and that's, of course, not to say that if that something was tested that any results would be found or that they would be in any way beneficial."

The trial judge commented that

"the court has really sort of bent over backwards given the stakes that are involved ... to indulge the defense in sort of more than reasonable inquiry to permit [petitioner] to take depositions where really no authority for it existed, but it seems to me that it's a logical and natural outgrowth of a process that contemplates the use of affidavits. [If] there's some reason to believe the affidavits are inadequate, where [they] don't speak to the entire process that you have a right to probe that information. And that was permitted in ·this case."

The Circuit Court acknowledged that the documents located by the State did not prove that the evidence had been destroyed but, instead, showed only the authorization for destruction. Nevertheless, at the conclusion of the September 26th hearing, the Court denied Horton's petition, stating that "there is no reasonable basis to believe that any further investigation is going to lead to discovery of any evidence that could be subjected to any test for DNA." A formal judgment

order denying the petition was entered on October 2, 2007. Thereafter, Horton filed a timely notice of appeal to this Court.

## III.

 The search conducted for DNA evidence related to petitioner Horton's convictions undoubtedly went several steps beyond the searches conducted in *Blake v. State, supra,* 395 Md. 213, 909 A.2d 1020, and *Arey v. State, supra,* 400 Md. 491, 929 A.2d 501. The search in this case came very close to meeting the standards set by the *Blake* and *Arey* opinions. Nevertheless, particularly in light of the narrowly tailored additional areas in which Horton wished to continue the search, the Circuit Court should not have dismissed the petition.

In arguments before both the Circuit Court and this Court, petitioner's counsel identified certain specific areas where an additional search was likely to reveal whether all of the evidence had, in fact, been destroyed. Defense counsel requested the opportunity to interview the State's affiants, Ms. Tontarski and Mr. Hanopole, regarding the documentary evidence which they had recovered as well as the "Form 526." Counsel also wished to speak with an individual from the Hospital's microbiology department concerning any tests for sexually transmitted diseases which might have been given to the victim, as well as the retention policy for those tests. In addition, petitioner's counsel wanted the State to supply the hospital with the victim's social security number in order to facilitate a search for her medical records, which the Hospital had not been able to locate using the victim's name and date of birth alone. Petitioner also points out that the State failed to provide information regarding the evidence storage facilities' protocols from the time of the criminal trial to the time of the petition.

The State argues that the Circuit Court was justified in holding that the State exerted reasonable efforts to locate the

pertinent evidence. The State contends that petitioner, in requesting a further search, was merely seeking information from two sources: the Hospital and the State's evidence collection units. According to the State, any evidence that may have been in either source had been destroyed.

Turning first to the matter of the evidence destruction protocol, our opinion in *Arey v. State, supra,* 400 Md. at 503, 929 A.2d at 508, stated that a reasonable search requires the State to "identify the protocol that was in place [for the destruction of evidence] from the time of the trial to the time of the request for testing, if possible, and see if that protocol was followed." The *Arey* opinion also pointed out, 400 Md. at 504, 929 A.2d at 508, that upon finding the protocols for handling and destroying evidence, "the State might ... discover [ ] other locations to search for the requested evidence or determine [ ] more conclusively its fate." Just as *Arey* required the State "to determine the proper protocol for handling and destroying evidence in Baltimore City in 1974," 400 Md. at 504, 929 A.2d at 508, the Circuit Court in this case should have required the State to determine, if possible, the proper protocol for handling and destroying evidence in Montgomery County in 1982.

The State's assertion, that searches at the Hospital and at the State's evidence collection units have demonstrated that any evidence relating to the crimes had been destroyed, is an over-statement. The "Form 526" and the other documentary evidence provided by the State show that evidence was authorized for destruction, but the State failed to establish that any evidence was actually destroyed. Moreover, those departments in the Hospital which had been searched and the State's evidence collection units (ECU) did not exhaust the list of locations where the evidence might be found. *See Arey v. State, supra,* 400 Md. at 502–503, 929 A.2d at 508 (listing numerous possible places where the evidence might be found, and stating that "[s]earching the ECU alone was insufficient"); *Blake v. State,* 395 Md. at 221–233, 909 A.2d at 1025–1031

(same).[5]

Furthermore, the search at the Hospital was not exhaustive. The petitioner specifically requested an interview with someone from the Hospital's microbiology department which may have tested the victim for sexually transmitted diseases. A former Hospital official had suggested that evidence concerning the victim might be in that department. The petitioner's request was confused. No hospital medical records regarding the victim were found, although the record shows that they did exist at one time. The petitioner requested that the State give the Hospital the victim's social security number, which would aid the Hospital in a search for the medical records, but the State refused.

We also agree with the petitioner that his counsel was not given an adequate amount of time to examine and investigate the "Form 526" and the documents referred to in the affidavit of Mr. Hanopole, as well as an opportunity to question him. The first mention of a "Form 526" and the first time the State supplied to petitioner's counsel the form was on September 24, 2007, only two days prior to the date of the final hearing and the court's final decision dismissing the petition. There is no indication in the record that the "Form 526" was included in the laboratory file previously turned over to petitioner's representative by Ms. Tontarski, the state's other affiant. The form described a great deal of evidence which had belonged to the victim, including the victim's clothes. Nevertheless, the petitioner's counsel had no opportunity to investigate the evidence referred to in the "Form 526" and to probe the State's assertions regarding the "Form 526." The State's response to the petitioner's request for a search of evidence in the State's possession, together with the affidavits of Ms. Tontarski and Mr. Hanopole and their comments regarding "Form 526" and other newly discovered documents, occurred

---

**5.** During oral argument before this Court, the Court asked counsel for the State whether the chambers of the judge who presided at Horton's criminal trial had been searched. Counsel answered in the affirmative. Subsequently, however, counsel for the State notified the Court that the trial judge's chambers had not been searched.

less than a month before the court's final hearing and decision. Compared to the length of time which the State utilized in searching for pertinent evidence in the State's and Montgomery County's possession, petitioner's counsel had little time to attempt to arrange for depositions or interviews with the affiants, Ms. Tontarski and Mr. Hanopole, as well as examining the "Form 526" and the other documents referred to by the affiants.[6]

For the reasons set forth above, and in view of this Court's prior opinions in actions under § 8–201, the judgment below should be reversed.

*JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED, AND CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.*

HARRELL, BATTAGLIA, and CATHELL, JJ., Dissent.

Dissenting Opinion by HARRELL, J., which CATHELL, J., joins.

I dissent. I would conclude that the State conducted a reasonable search for the possible DNA-containing evidence, under the circumstances of this case, and affirm the judgment of the Circuit Court for Montgomery County.

The search for testable DNA evidence in the present case met the standard of a reasonable search set forth in *Blake v. State*, 395 Md. 213, 909 A.2d 1020 (2006) and *Arey v. State*, 400 Md. 491, 929 A.2d 501 (2007). In *Blake*, we established the appropriate burdens of proof when the State contends that the requested evidence no longer exists. When the State seeks to have a petition for DNA testing dismissed on the ground that the requested evidence no longer exists, the burden is on the State to establish that the evidence no longer exists. 395 Md.

---

6. In light of the State's position that depositions are not appropriate in a § 8–201 action, *see* n. 4, *supra*, petitioner's counsel may have encountered some difficulty in deposing the two affiants.

at 232, 909 A.2d at 1031. The burden is so placed because "the State gathered the evidence and was the custodian of the evidence. The information as to the location of the evidence and the manner of its destruction would not be within the knowledge of an inmate." *Id.* "At a minimum, a motion to dismiss a postconviction DNA testing petition on grounds that testing evidence does not exist should be supported by an affidavit before the court may grant the motion." *Id.* at 233, 909 A.2d at 1032.

Although "when an inmate files a petition for postconviction DNA testing, the State should make an extensive search for the evidence," *Blake,* at 232, 909 A.2d at 1031, we explained in *Arey* that the extent of the required search is measured against a reasonableness standard. *See Arey,* 400 Md. at 504, 929 A.2d at 508 ("[A] court should not conclude that evidence no longer exists until the State performs a reasonable search for the requested evidence."). This standard requires the State "to check any place the evidence could reasonably be found, unless there is a written record that the evidence had been destroyed in accordance with then existing protocol." *Id.* at 503–504, 929 A.2d at 508. "Once the State performs a reasonable search and demonstrates sufficiently a *prima facie* case, either directly or circumstantially, that the requested evidence no longer exists, the State will have satisfied its burden of persuasion." *Id.* at 505, 929 A.2d at 509.

If the State satisfies its burden, "[t]he burden of production then shifts to the petitioner to demonstrate that the evidence actually exists." *Id.* In *Blake,* we held that an "unsworn, unverified memorandum" was insufficient to sustain the State's burden of proof as to destruction. 395 Md. at 231–32, 909 A.2d at 1031. In *Arey,* the State filed an affidavit of the police officer in charge of the Evidence Control Unit (the "ECU"). 400 Md. at 499, 929 A.2d at 505–506. The affidavit asserted that the officer had searched the ECU database and ECU forms on file, but was unable to find the requested evidence or any forms that referenced the requested evidence. *Id.* at 499, 929 A.2d at 506. Therefore, the officer concluded that the requested evidence no longer existed. *Id.* We held

that this search also was insufficient. *Id.* at 503, 929 A.2d at 508.

The Majority opinion here concludes that the State did not conduct a reasonable search for several reasons, although conceding that the search here "undoubtedly went several steps beyond the searches conducted" in *Blake* and *Arey.* (Maj. op. at 15, 985 A.2d at 548). The State conducted multiple searches in various locations. A search of the Montgomery County Crime Laboratory failed to uncover any evidence. A search of the various computer programs maintained by the Montgomery County Police Department (the "MCPD") to catalog physical evidence and several physical searches of the Central Property/Evidence Unit and Police headquarters failed to yield any leads. The State was also unable to find any evidence after searching both the State's Attorney's and the Circuit Court's files in Petitioner's underlying case. Finally, a Suburban Hospital (the "Hospital") employee conducted a physical search of the Hospital, but failed to find any evidence related to Petitioner's case. The State found, however, a police document indicating that the evidence had been authorized for destruction in 1986.

The Majority opinion concludes, under *Arey* and despite these extensive searches, that the Circuit Court should have required the State to identify the protocols for handling and destroying evidence in Montgomery County in 1982 and subsequent years (Maj. op. at 17, 985 A.2d at 549). I do not read *Arey* to require such a showing in every case. In *Arey,* we held that the Circuit Court erred in dismissing the petition based on a police officer's representation in an affidavit that "because he checked the ECU's database and forms on file, it was reasonable to conclude that the evidence no longer exists." 400 Md. at 502, 929 A.2d at 508. That affidavit was the only basis in *Arey* for the State's motion to dismiss the petition for DNA testing.[1] *Id.* at 499, 929 A.2d at 506. There was no indication that the evidence had been authorized for destruc-

---

1. It does not appear from the facts recited in our opinion in *Arey* that the police conducted a physical search of the ECU.

tion. The State also did not search the crime laboratory. We noted that, "[t]he evidence in this case had been tested by a laboratory; slides possibly had been made." *Id.* at 503, 929 A.2d at 508. Because the State did not conduct a reasonable search, we held that "the State should have attempted to determine the proper protocol for handling and destroying evidence in Baltimore City in 1974." *Id.* at 504, 929 A.2d at 508. Knowledge of the proper protocol might have helped the State

> discover[ ] other locations to search for the requested evidence or determined more conclusively its fate. At a minimum, a reasonable search in the instant case would have required the State to look in the crime lab referred to in Detective Russell's testimony, if the lab is still in existence, for any slides used to test the blood evidence used against appellant or for pieces of the clothing he requested; the property room if it was different from the ECU; and because the testimony at trial was that the evidence had been stored in the Judge's chambers, as unlikely as it is that it would be there after all these years, an inquiry as to that location.

*Id.* at 504, 929 A.2d at 508–509.

In Horton's case, the police conducted multiple physical searches of locations where the evidence might be located, in addition to searching multiple evidence/property databases and the crime laboratory. Furthermore, the trial court ordered the Hospital to search for any evidence it might have. No evidence was found. The State presented two signed affidavits asserting that the State no longer had any evidence relating to Petitioner's 1983 conviction. The first affidavit was made by Karolyn Leclaire Tontarski, a forensic scientist formerly in the Forensic Biology Unit of the Montgomery County Crime Laboratory. The second affidavit was made by Arthur D. Hanopole, a Supply Technician III in the Supply and Central Property Unit of the MCPD. In her affidavit, Tontarski stated that "[i]n 1982, no stained portions of items were retained in the Crime Laboratory." Nevertheless, she conducted a search of the Forensic Science Biology Unit evidence vault. Her search confirmed that the laboratory did

not possess any physical evidence related to Petitioner's conviction.

In his affidavit, Hanopole detailed the numerous searches he conducted for evidence related to Petitioner's conviction. First, he conducted a computer search of the MCPD's Quetel Evidence System (the "System"). He explained in his affidavit that the System, in place since September 1999, is "intended to track all physical evidence and property maintained by the Central Property/Evidence Control Unit of the [MCPD]. . . ." and only contains pre–1999 evidence "if an item of evidence was moved from one location to another after the Quetel Evidence System was put in place." The underlying rape and other crimes for which Petitioner was convicted occurred on 29 September 1982. His trial took place in 1983. Thus, the System would only contain evidence related to his conviction if the evidence had been moved to another location. Hanopole did not find a record of any evidence from Petitioner's case in the System.

Next, he searched the 1982 handwritten log that, as asserted in his affidavit, contains a record of "all . . . evidence received by the Central Property/Evidence Unit . . . in the year of 1982." As noted previously, the underlying rape and other crimes for which Petitioner was convicted occurred in 1982. In the log, he found an entry reflecting that the evidence from Petitioner's case was assigned the reference number R.247665 when the Unit received the evidence. He was unable, however, to find any other paper file or computer entry referring to the designation R.247665.

After an Assistant State's Attorney advised Hanopole "that there existed a copy of a document addressed to Central Property, Police Headquarters, which bore the designation R.247665 and the signature of Officer J. Hennesey, and which specified that the evidence in R.247665 could be destroyed," he searched the "Closed 2: Table" database and found a reference there to R.247665. He stated in his affidavit that it was his understanding that a group of police officer candidates created the "Closed 2" database on 24 October 2003, while

reviewing boxes of 526 Forms being sent to archives and that the 526 Forms that they reviewed that day "were for cases in which the evidence had been destroyed." He explained that a "526 Form is a Central Property/Evidence Unit form that reflects receipt of property by the Central Property/Evidence Unit." Even though all evidence at the Central Property/Evidence Unit was scanned into the Quetel Evidence System in 2006, Hanopole and a co-worker conducted a physical search of the Central Property/Evidence Control Unit's storage area on 9 July 2007. They "started at opposite ends of the storage area and each went shelf-by-shelf to the other end looking at every box to determine whether if [sic] bore the designation R.247665." Neither found any relevant evidence.

Finally, on 23 August 2007, Hanopole stated that he "physically searched a storage area behind Police Headquarters that is referred to as 'the shed.' " The only evidence in that location was related to cases from 1995 or later, with the exception of evidence from one 1975 case. Again, he did not find any evidence related to Petitioner's conviction.

The State also conducted a search of the State's Attorney's Office's and the Circuit Court for Montgomery County's files from Petitioner's case. The State's file did not contain any physical evidence from Petitioner's case. The Circuit Court's file contained letters dated 3 December 1984 to Petitioner's counsel and counsel for the State advising the parties that they had thirty days in which to arrange to pick up their respective trial exhibits. The letter states that the Clerk "shall dispose of them in such a manner as may be appropriate," unless retrieved. The file also contained a receipt indicating that a "Sergeant Thomas Kestel" retrieved the State's evidence on 20 December 1984. The State also asserted, in its Response to Request Dated June 15, 2007, that Police Officer III William L. Bickle, the current Evidence/Property Manager of the MCPD, had a conversation with retired Detective Hennessey, the officer who signed the Form 526, in which he explained "that it was the practice at the time he approved the destruction of the physical evidence maintained by the Central Property Unit in the Horton case to authorize destruction of

evidence in a non-capital case once the direct appeal process in a case was concluded." [2]

In my view, the multiple searches in various locations demonstrate that the State met its burden to conduct a reasonable search and presented affidavits in support of its assertion that the evidence no longer exists. These were not mindless, "make work" labors, but carefully considered and targeted forays. Therefore, the State should not have to identify the protocol for handling and destroying evidence in Montgomery County in 1982 and subsequent years, as required by the Majority opinion in its too generous application of the statute and cases.

Second, the Majority opinion opines that the search was insufficient because the search for DNA evidence did not exhaust the list of locations where evidence might be found as enumerated in *Blake* and *Arey* (Maj. op. at 7, 17, 985 A.2d at 543, 549). The Majority opinion asserts that "an appropriate search should include certain most likely places, including police evidence or property rooms, the prosecutor's office, state and local crime laboratories, hospitals, defense investigators, courthouse property rooms, offices of defense counsel, independent crime laboratories, clerks of court and court reporters." (Maj. op. at 7, 985 A.2d at 543). Judged by this statement, the Majority, apparently, foretells that it would hold that, in every case, the State is required to search all of those locations, regardless of whether there is any indication in the record to suggest that there is any likelihood that evidence might be found in such a location or locations.

*Arey* does not require that each of its enumerated locations be searched in every case. *Arey* requires only a search of locations where the record indicates relevant evidence reasonably is likely to be found. The places enumerated in *Arey* were only suggestions of possible locations to be searched, not a mandatory scavenger hunt list. For example, here the State

---

**2.** On 22 October 1984, we denied Horton's Petition for Writ of Certiorari. 301 Md. 176, 482 A.2d 501, 502 (1984).

did not search the trial judge's chambers (Maj. op. at 17 n. 5, 985 A.2d at 549 n. 5). Although, as the Majority opinion notes, evidence found in the trial judge's chambers in the case of Kirk Bloodsworth led to the discovery of exonerating DNA evidence (Maj. op. at 6-7, 985 A.2d at 543-44), we never have held that a search of the trial judge's chambers is required in every case. In *Arey*, we opined that the State should search the trial judge's chambers because there was testimony that the evidence was stored there during the underlying trial. 400 Md. at 504, 929 A.2d at 509. There is no such evidence in the record in the present case. The State in the present proceeding has searched all places the evidence reasonably might be found and satisfied its burden as articulated in *Blake* and *Arey*.

The Majority opinion explains further that the search was not reasonable because the search at the Hospital was not exhaustive (Maj. op. at 17, 985 A.2d at 549). It bases this conclusion on two rationales. First, the Majority apparently agrees with Petitioner's argument that the court should have allowed him to depose or interview an employee from the Hospital's microbiology department. Petitioner alleges that his counsel spoke with a former employee of the Hospital's histology department, following Horton's deposition of the Hospital's designated legal representative.[3] He alleges that the former employee stated that, *if* the hospital had performed a test on the victim for sexually transmitted diseases, the microbiology department, not the cytology or histology departments, would have processed the results and may have retained the tested specimen(s). The former employee did not know whether such a test had been performed on the victim. Because the Hospital's representative only testified with regard to the cytology and histology departments, Petitioner argued that he ought to be able to interview someone from the microbiology department. The Majority points out that, in *Arey*, the Petitioner "suggested another possible location for

---

**3.** At the 26 September 2007 hearing, Petitioner's counsel identified the former employee as Cassie Arthur.

the requested evidence, namely the trial judge's chambers, where the trial transcript showed that the evidence had been stored...." (Maj. op. at 7, 985 A.2d at 543). Here, unlike the evidentiary-backed suggestion in *Arey* that evidence might be in the trial judge's chambers, there is no mention in the record in this case that the hospital performed any such tests on the victim. Furthermore, although Petitioner's counsel may have spoken to the former employee after the deposition of the Hospital representative, Petitioner had the opportunity to depose a Hospital representative. We are not obliged to permit another interview or deposition of someone else based on the unsupported theory that some unidentified employee might know something about evidence that might exist.

The second ground upon which the Majority opinion props up its conclusion that the search at the Hospital was not exhaustive is the trial court's refusal to order the State to provide the Hospital with the victim's social security number (Maj. Op. at 7, 985 A.2d at 543). Petitioner requested the victim's social security number so that the Hospital could perform a second search for the victim's medical records. It is not clear from the record specifically how the social security number would aid the hospital in better searching for evidence when a search using the victim's name and date of birth yielded no evidence. There are substantial privacy issues related to this request and it was reasonable for the trial court to deny Petitioner's request, especially when a search using the victim's name and date of birth failed to uncover any evidence relating to Petitioner's conviction.

Finally, the Majority opinion determines that "the petitioner and his counsel were not given an adequate amount of time to examine and investigate the 'Form 526' and the documents referred to in the affidavit of Hanopole, as well as an opportunity to question the him." (Maj. op. at 17, 985 A.2d at 549). Petitioner, however, had approximately four years to interview the one affiant, Tontarski. She stated in her affidavit that, in a letter dated 2 December 2002, she informed Erin E. Murphy, a student at the Georgetown University Law Center, who was assisting the Mid–Atlantic Innocence Project (the "Inno-

cence Project") with its investigation of Petitioner's case, that the paperwork in the laboratory's file indicated that the evidence related to Petitioner's conviction "was signed over for destruction on March 17, 1986 once it was determined that all appeals had been exhausted and the case was considered closed." The letter and Tontarski's affidavit state that she turned over all documents in the laboratory's file to the Innocence Project, and "specifically the laboratory reports, bench notes, and chain of custody/destruction documents." According to Petitioner's brief, the Innocence Project assisted Petitioner in obtaining his present counsel. Petitioner does not assert that he did not have knowledge of this letter. Moreover, counsel for the State discussed the letter at the 18 June 2007 hearing, at which Petitioner was represented by counsel. Although, as noted by the Majority opinion, it is unknown whether the "Form 526" was among the "custody/destruction documents" that Tontarski turned over to the Innocence Project, (Maj. op. at 17-18, 985 A.2d at 549), it is undisputed that Petitioner had knowledge of the fact that the paperwork in the laboratory file indicated that the evidence in his case had been authorized for destruction. He could have, upon receipt of the letter, or at any other time in the intervening four years, interviewed or requested to depose Tontarski. Petitioner took neither course. From this, I conclude that Petitioner had over four years to interview Ms. Tontarski.

The State conducted an extensive search in this case and demonstrated circumstantially, if not directly, that the evidence was destroyed. It searched not only the MCPD's computer and paper evidence files, but also directed several physical searches to be made, in addition to the search conducted by the Hospital. The State satisfied its burden by searching any location the evidence reasonably might be found and submitting affidavits detailing its efforts and supporting its conclusion that the evidence no longer exists. Thus, the burden of production shifted to Horton. Petitioner has not satisfied his burden by demonstrating that the evidence exists. The Majority opinion demands that the State continue to hunt for the Grail, well beyond the standards set forth in *Blake* and

*Arey. Blake* and *Arey* require only reasonable efforts. I would affirm the judgment of the Circuit Court for Montgomery County. Accordingly, I dissent.

Judge CATHELL authorizes me to state that he joins this dissent.

Dissenting Opinion by BATTAGLIA, J.

As I stated in my dissent in *Arrington v. State,* 411 Md. 524, 983 A.2d 1071 (2009), and for the same reasons therein, "I respectfully dissent because the majority reaches the merits of the case, although we never granted certiorari."