*In re M.Z.*, No. 8, September Term, 2024. Opinion by Killough, J.

**APPEALABILITY.** When the trial court terminates a child in need of assistance ("CINA") proceeding against the request of the parent to keep the proceeding open to receive additional services through the local department of social services, the parent is an aggrieved party entitled to an appeal.

Circuit Court for Baltimore County
Case No.: C-03-JV-22-000756
Argued: October 1, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 8

September Term, 2024

IN RE M.Z.

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

Opinion by Killough, J.

Filed: March 24, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Under Maryland law, a local department of social services may initiate an action in a juvenile court to have a child declared a "child in need of assistance"—commonly known by the acronym "CINA"—when the local department has reason to believe that a child is a victim of abuse or neglect. If the circuit court acting as a juvenile court finds that the child is a CINA, it will conduct additional proceedings to provide the necessary assistance to the child. At issue in this case is what appellate rights, if any, the custodial parent has when the juvenile court terminates the CINA case of a child over that parent's objection.

Seventeen-year-old "M.Z." was adjudicated as a CINA by the Circuit Court for Baltimore County, sitting as a juvenile court, based on the petition by the Respondent, Baltimore County Department of Social Services ("Department"). After rendering services, including an out-of-home placement in a therapeutic youth group home, the Department sought to terminate the CINA case. The Petitioner ("Mother") objected to the Department's request to terminate the CINA case due to M.Z.'s behavior. To address her concerns, Mother sought additional services and continued court oversight for M.Z. After a hearing, the juvenile court granted the Department's request to terminate the CINA case over Mother's objection. Mother timely appealed to the Appellate Court of Maryland. The Appellate Court dismissed Mother's appeal, holding that she was not "aggrieved" by the juvenile court's termination of the CINA petition. *In re M.Z.*, No. 1412, Sept. Term, 2023, 2024 WL 833367, at *6 (Md. App. Ct. Feb. 28, 2024). The Appellate Court reasoned that Mother was not entitled to appeal the termination of the CINA case because it was a "favorable" judgment due to M.Z. being returned to Mother's custody. *Id.* at 5.

We granted *certiorari* to address the following question: when a circuit court terminates its jurisdiction in a CINA case over the objection of a parent, is that parent "aggrieved" by the court's judgment such that the parent is entitled to appeal? As explained below, we hold that a parent is entitled to appeal the termination of a CINA case involving their child where that parent objects to the termination on the basis that closure of the case is not in the best interest of the child. We therefore reverse the judgment of the Appellate Court of Maryland and remand this matter to the Appellate Court for further proceedings to resolve the merits of Mother's appeal.

## I

### THE CINA PROCESS

The General Assembly enacted a comprehensive statutory scheme to address situations where a child is at risk because of the parent's or parents' inability or unwillingness to care for the child. The purposes of the CINA statute, among other things, are "[t]o provide for the care, protection, safety, and mental and physical development of any child coming within the provisions [of the CINA statute]" and "[t]o conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare[.]" Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 3-802(a)(1), (3).

Our previous cases reflect the balance the General Assembly sought to achieve when it enacted the CINA statute. The liberty interest of parents to raise their children as they see fit without undue interference by the State is a fundamental right under the Fourteenth Amendment to the United States Constitution. *See In re Yve S.*, 373 Md. 551,

2

565 (2003). But this right is not absolute and is a secondary consideration if there is evidence that the child's welfare is at risk. *See Boswell v. Boswell*, 352 Md. 204, 219 (1998); *see also In re Mark M.*, 365 Md. 687, 706 (2001) ("That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent."). "In fashioning the CINA statute, the General Assembly has been cognizant that the law must accommodate these sometimes competing interests." *In re O.P.*, 470 Md. 225, 234 (2020) (footnote omitted).

The procedures governing CINA cases are outlined in CJP Section 3-801 *et seq.* A CINA is a child who requires court assistance because the child has been abused or neglected, or has a developmental or mental disability, and the child's caretaker is "unable or unwilling to give proper care and attention to the child and the child's needs." CJP § 3-801(f), (g).

*Adjudicatory Hearing*

After a CINA petition is filed, the juvenile court must hold an adjudication hearing. The purpose of this hearing is for the court to decide "whether the allegations in the petition . . . are true." CJP §§ 3-801(c), 3-817. The court must find that: (1) "[t]he child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) [t]he child's parents, guardian, or custodian are unable or unwilling to provide appropriate care and attention to the child and the child's needs." *Id.* § 3-801(f). If the court makes this finding, it then holds a disposition hearing. *Id.* § 3-819(a); *see also* Md.

3

R. 11-216(a)(2) ("Unless a CINA petition is dismissed, the court shall . . . conduct a separate disposition hearing to determine whether the respondent child is a [CINA].").

*Disposition Hearing*

Having made the requisite findings that the allegations in the CINA petition are true, the court then holds a separate disposition hearing to determine whether the child is, in fact, a CINA and, if so, the nature of any necessary court intervention.  *See* CJP §§ 3-801(m), 3-819(a).  Although the disposition hearing is "separate" from the adjudicatory hearing, the two hearings are ordinarily held on the same day.  *Id.* § 3-819(a).  The court may find that the child is not a CINA and dismiss the case.  *See id.* § 3-819(b)(1)(ii)(4). Alternatively, the court may determine that the child is a CINA, in which case it may take one of three actions: (1) decide not to change the child's current custody; (2) commit the child to the custody of a parent, relative, or another suitable individual; or (3) commit the child to the custody of the local department of social services or the Maryland Department of Health.  *See id.* § 3-819(b)(1)(iii).  If the child is committed to the custody of the local department of social services, the court must also conduct a permanency planning hearing to determine the long-term plan for the child's placement.  *See id.* § 3-823(b).

*Permanency Plan*

When a child is declared a CINA, the local department of social services must develop a "permanency plan" that is "consistent with the best interests of the child[.]"  CJP § 3-823(e)(1)(i); *see also In re Adoption of Jayden G.*, 433 Md. 50, 55 (2013).  The permanency plan is intended to "set[] the tone for the parties and the court" by providing "the goal toward which [they] are committed to work."  *In re Damon M.*, 362 Md. 429, 436

4

(2001). "In this regard, the permanency plan is 'an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement.'" *In re Adoption of Jayden G.*, 433 Md. at 55 (quoting *In re Damon M.*, 362 Md. at 436). An initial permanency planning hearing, during which the juvenile court reviews or approves of a permanency plan, must be held "[n]o later than [eleven] months" after the child enters out-of-home placement. CJP § 3-823(b)(1)(i).

The permanency plan may be decided, to the extent consistent with the child's best interest, in a "descending order of priority:" (1) reunification with a parent or guardian; (2) placement with a relative for adoption or custody and guardianship; (3) adoption by a nonrelative; (4) custody and guardianship by a nonrelative; or (5) for children at least sixteen-years-old, another planned permanent living arrangement. *Id.* § 3-823(e)(1). The juvenile court must review the permanency plan at a review hearing "at least every [six] months" until the child is no longer committed to the Department. *Id.* § 3-823(h)(1)(i). At the permanency plan review hearing, the court must:

(i) Determine the continuing necessity for and appropriateness of the commitment;

(ii) Determine and document in its order whether reasonable efforts have been made to finalize the permanency plan that is in effect;

(iii) Determine the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment;

(iv) Project a reasonable date by which a child in placement may be returned home, placed in a preadoptive home, or placed under a legal guardianship;

5

(v)     Evaluate the safety of the child and take necessary measures to protect the child;

(vi)    Change the permanency plan if a change in the permanency plan would be in the child's best interest; and

(vii)   For a child with a developmental disability, direct the provision of services to obtain ongoing care, if any, needed after the court's jurisdiction ends.

*Id.* § 3-823(h)(2).

In determining the permanency plan, the court is required to consider the statutory factors set forth in Section 5-525(f)(1) of the Family Law Article ("FL") and to give "primary consideration" to the "best interests of the child[.]"  CJP § 3-823(e)(2); FL § 5-525(f)(1).  The Department and the juvenile court must make "[e]very reasonable effort" to permanently place the child within twenty-four months.  CJP § 3-823(h)(5).

*Termination of a CINA Case*

A CINA case ends when the child reaches the age of twenty-one or when the juvenile court finds that the child is no longer in need of assistance and no longer needs services from the State.  *See* CJP § 3-804(b); Md. R. 11-220(a).  The procedure for determining that no further services are needed in a CINA case is governed by CJP Section 3-819.  After a CINA finding and the establishment of a services plan, the court is required to conduct periodic review hearings "at least every six months" to assess the child's safety, permanency plan, and the progress of services provided by the local social services department.  CJP § 3-816.2.  If the child is placed in a qualified residential treatment

6

program, the court shall conduct a hearing to "determine the appropriateness of placement within [sixty] days after the child enters the placement."[1] *Id.* § 3-816.2(b)(1).

At any time after a CINA finding, the local social services department or any party (including the child's attorney, the parents, or a guardian *ad litem*) can file a motion taking the position that no further services are necessary. Alternatively, during a scheduled review hearing, the local social services department can report that services have been exhausted or are no longer required because the issues have been resolved or cannot be further addressed by agency intervention. CJP § 3-816.2(a). The court will conduct a hearing to review the local department's report, hear arguments from all parties, and consider evidence regarding the child's current circumstances and whether continued services are needed. *See id.* § 3-816.2(a)(2). The court must determine whether the local department of social services has made reasonable efforts and whether the child's needs are being met without continued court oversight. *See id.* If the court finds that the child is no longer in need of assistance, or that no further services by the local social services department are necessary, the court may order the case closed, terminating jurisdiction. *See id.* §§ 3-816.2(a)(2)(v), 3-804(c).

*      *      *      *

Against this overview of the statutory scheme pertaining to CINA cases generally and having set out the proper context, we now turn to the facts underlying this case.

---

[1] A qualified residential treatment program is a program within a licensed childcare institution that provides continuous twenty-four-hour care and supportive services to children in a residential, nonfamily home setting. *See* CJP § 3-801(w).

7

FACTUAL AND PROCEDURAL BACKGROUND

A. Facts

M.Z. was born on June 16, 2007, and has lived with her mother since birth. She has no relationship with her father, who resides in Guatemala. M.Z. and her mother have had a strained relationship for some time, and they have an extensive history with the Department. The Department first became aware of M.Z. on November 18, 2019, when the Department began providing services to her through the Interagency Family Preservation Services Unit.[2] These services were discontinued in June 2021.

In January 2022, the Department reopened its case after learning that M.Z., then fifteen, was in a relationship with an eighteen-year-old male. The Department discussed the possibility of foster care with M.Z.'s mother after she expressed concerns about managing M.Z.'s behavior. However, Mother ultimately decided she would continue to manage M.Z.'s care.

In March 2022, the Department convened a Family Team Decision Meeting[3] to discuss further services for M.Z. Following a substance abuse assessment, the Department

---

[2] The Interagency Family Preservation Services Unit is a voluntary "time-limited intensive program available within the local departments of social services." Maryland Department of Human Services, Local Offices, Somerset County, *available at* https://perma.cc/TK7J-K7D7. The program seeks to promote stability for families with children at risk of out-of-home placement by engaging in community resources and direct services to enable families to remain together in a safe and stable environment. *Id.*

[3] Family Team Decision Meetings are led by specially trained social workers who are experts in bringing together families and agency staff for these meetings. Maryland

referred M.Z. to attend TurnAround services.[4]  Shortly thereafter, M.Z. ran away from home and returned a few days later intoxicated.  Between March and April 2022, M.Z.'s mother enrolled her at the Kennedy Krieger Institute,[5] but M.Z. was discharged on April 14, 2022, due to noncompliance.

Throughout the summer of 2022, M.Z.'s behavior continued to deteriorate.  In June 2022, M.Z. ran away from home, physically attacked her mother, and attempted to jump off a bridge.  On June 14, 2022, the Department provided Mother with a referral for M.Z. for mental health services.  In August 2022, M.Z. ran away from home again and was found intoxicated by her mother.  In September 2022, M.Z. ran away once more and was found by her mother intoxicated and unconscious, with an older man kissing her.  On October 4, 2022, during a Family Team Decision Meeting, Mother expressed that she could no longer manage M.Z.'s behavior and was concerned for M.Z.'s well-being.  On October 21, 2022,

---

Department of Human Services, Local Offices, Baltimore City, Kinship Care – Strengthening and Preserving Family Ties, *available at* https://perma.cc/VY9W-4E2P. These meetings provide opportunities for the family, the family's support system, and the local department of social services workers to sit down and make a plan to address concerns regarding the safety and well-being of a child in the home.  *Id.*

[4] TurnAround provides services to survivors of intimate partner violence, sexual violence, and human trafficking in Baltimore County and Baltimore City, and survivors of human trafficking in Howard County.  *See* TurnAround Inc., About Us, *available at* https://perma.cc/3XGR-E2QK.

[5] The Kennedy Krieger Institute is a nonprofit organization that provides inpatient and day hospital programs to children, adolescents, and adults with neurological, rehabilitative, or developmental needs.  *See* Kennedy Krieger, About Us, *available at* https://perma.cc/9UCM-VTQ6.

Mother, along with a social worker from the Department, placed M.Z. in The Children's Home[6] for a ninety-day diagnostic program.

### B. Circuit Court Proceedings

On October 24, 2022, the Department filed a CINA Petition with Request for Shelter Care[7] based on M.Z.'s behavioral history and Mother's admission during a Family Team Decision Meeting that she could no longer manage M.Z. The juvenile court held an adjudicatory hearing the same day on the Department's CINA Petition with Request for Shelter Care. All parties (M.Z., Mother, and the Department) were represented by counsel throughout the CINA proceeding. Mother agreed with the Department that M.Z. should be temporarily placed in an out-of-home placement and requested permission to visit with M.Z. a few times a week.

The juvenile court sustained the CINA Petition and granted the request for continued shelter care after finding that the Department made reasonable efforts to prevent or eliminate the need for removal by assessing the child's safety, engaging the family with

---

[6] The Children's Home, located in Catonsville, Maryland, provides residential therapeutic care to youth between the ages of thirteen and twenty-one who have experienced abuse, neglect, violence, or abandonment, or need supervised care. The Children's Home, Diagnostic Program, *available at* https://perma.cc/F6CX-H6MM. The Children's Home Diagnostic Center provides statewide emergency placement and crisis intervention to adolescent girls through cognitive behavioral interventions with a focus on holistic healing and strength-based interventions. *Id.*

[7] Shelter care is defined as "a temporary placement of a child outside of the home at any time before disposition." CJP § 3-801(cc). Shelter care is not a component of every CINA case. A local department may authorize emergency shelter care for a child who may be at risk in the home while the CINA petition is pending. *See id.* § 3-815(a); Md. R. 11-204(b).

family-preservation services, and making referrals to treatment providers. The juvenile court placed M.Z. in the custody of the Department pending further disposition and granted the Department temporary limited guardianship over M.Z. The juvenile court also ordered that Mother have liberal and unsupervised visits with M.Z., after finding that there was no likelihood of further abuse or neglect by Mother.

Following the October 24, 2022 shelter care hearing, M.Z. remained at The Children's Home to complete a ninety-day diagnostic program. On November 18, 2022, the juvenile court held an adjudication and disposition hearing. The juvenile court found M.Z. to be a CINA and made express findings that Mother was unable to manage M.Z.'s behavior, which included constant elopement, alcohol abuse, and sexual relationships with adults.

M.Z. completed the ninety-day diagnostic program at The Children's Home on February 1, 2023. M.Z. was diagnosed with posttraumatic stress disorder, unspecified mood disorder, and disruptive mood dysregulation disorder. While at The Children's Home, M.Z. was compliant with program rules and expectations, completed the program on time, and it was recommended that she return home to Mother if Mother was willing and able to care for M.Z. Upon completion of the diagnostic program, M.Z. returned home with Mother on February 1, 2023. M.Z. struggled upon returning home. On April 10, 2023, during a Family Team Decision Meeting, Mother requested that the Department pursue another out-of-home placement for M.Z., but M.Z. wished to remain home, and Mother withdrew her request for placement.

11

The initial permanency plan review hearing was conducted on April 17, 2023. Mother and her counsel were present with an interpreter, as was M.Z.'s counsel and counsel for the Department. The Department requested that the juvenile court terminate the CINA case because it had provided the "needed services for a successful reunification," and Mother had "demonstrated that she can adequately care for [M.Z.] in her home," and knows how to access the services in the community if they are needed. At the time, M.Z. had been at home with Mother for just over two months and was receiving mental health therapy and services through TurnAround. Mother opposed the Department's request to terminate the CINA case due to M.Z.'s ongoing behavioral issues. During the hearing, Mother's counsel conveyed Mother's concerns about being unable to care for M.Z. on her own and her reluctance to rely on community services alone for M.Z. Mother's counsel asserted that the Department had not exhausted all possible resources for M.Z., as additional shelter care was still an option. M.Z.'s counsel conveyed M.Z.'s desire to remain home with her mother as opposed to going "back into foster care or back into a group home." M.Z.'s counsel also expressed concern that if the CINA proceeding was closed, the parties might return with another petition for shelter care within a month. At the review hearing, the magistrate continued the CINA case for ninety days, reasoning that if the CINA proceeding were terminated, M.Z.'s behavior may result in another CINA petition.

The next permanency plan review hearing was held on July 21, 2023. At the hearing, the Department again requested termination of the CINA case, asserting that M.Z. had failed to comply with recommended services. Mother renewed her request for the case

to continue, citing M.Z.'s lack of engagement with community resources, ongoing issues with running away, inappropriate interactions with older men, substance abuse, and suicidal ideations. Mother also requested agency placement in another ninety-day diagnostic residential treatment program with continued court oversight.

The Department opposed another placement, noting M.Z.'s refusal to engage in such a placement and her ongoing noncompliance with offered services. The Department acknowledged Mother's role as a key supporter and advocate for M.Z., having adequately cared for her since her return home, and it identified available community services.

Mother again raised concerns about M.Z.'s suicidal ideations and noted a recent suicide attempt. She requested that the CINA case remain open to ensure M.Z. received the necessary services, as M.Z. had refused outpatient care. The magistrate denied the Department's request to close the case and scheduled another review in ninety days. The Department filed exceptions to the magistrate's findings, conclusions, and recommendations under Maryland Rule 11-103(e).[8]

On August 21, 2023, the juvenile court conducted an exceptions hearing, admitted the Department's court report, and heard arguments. Despite the juvenile court's initial characterization of M.Z. as being "a normal teenager" and the Department's agreement

---

[8] Under Maryland Rule 11-103(e), the findings and recommendations of a magistrate in a CINA proceeding are typically subject to review by a circuit court judge. When a party objects to the findings and recommendations of the magistrate, a circuit court judge shall hold a hearing either de novo or on the record about the specific issue(s) the excepting party has raised. Md. R. 11-103(f).

13

with the assessment, M.Z.'s own counsel noted that "[h]er behavior is pretty bad . . . [and M.Z.] was kind of indifferent on whether her case should be kept open."

Mother disagreed with the assessment that M.Z. was a "normal teenager" and "doing well," noting M.Z.'s aggression, drug and alcohol use, self-harm, suicidal ideations, and an actual suicide attempt by ingesting Mother's medications. Mother argued that M.Z. needed an in-patient placement and higher levels of care and emphasized her belief that the Department could do more. M.Z., through counsel, was adamant about wanting to remain in Mother's home. The Department supported M.Z.'s desire to remain at home, adding that M.Z. had been with her mother for the past six months and Mother had been properly caring for M.Z. The Department argued that:

> [W]e have a child who if we change this placement, she's not going to stay where we change. We have a child who's not being neglected by her mother. We have a child who has been in the home with her mother for, I believe at this point it's more than six months. And it's not perfect but the child's needs are all being met. When things don't go well, the mother – it's not like the mother has thrown up her hands and said I'm done. The mother, when things don't go well, as the Court said, with a teenager, the mother is tending to the child's needs and doing the things that need to be done. . . . I will also note that the mother also knows that she can pick up the phone and call the Department of Social Services at any point.

Mother's counsel responded to the Department's position by arguing that the community-based services the Department referenced were not enough, stating:

> [I]t has been very clear, Your Honor, that [M.Z.] has refused all outpatient options regarding therapy or outpatient community services like mental health evaluations and that's why I continue to reiterate the request. And it's one thing to have a mother wait for something such as an actual suicide attempt to happen and the Department still fail this family. But now they're saying that they need more and that nothing can be done.

As a last resort, Mother requested that the juvenile court directly order that M.Z. be placed in a ninety-day diagnostic program. Mother, through counsel, asserted that while there might be a shortage of space available in such a program, it was not a reason to close the case; she preferred that the case remain open until space was available.

The juvenile court sustained the Department's exceptions and terminated its jurisdiction over M.Z. The circuit court judge provided the following explanation for its decision:

> I am going to terminate this case. . . . [W]hat we're doing is putting the full responsibility on the mother which it is her child and to the best of my understanding from what has been presented to me is the mother is not proven to be an inappropriate parent.
>
> CINA cases are typically situations in which we have a parent issue. That has not been the case here. Certainly I understand the idea about the emergency petition. A mother can do that as well.
>
> We have a child who's refusing to leave the home. . . . [M.Z's attorney has] done this for a long time. And he has made the representation that this is not an ideal situation, if I got his representation correct, that it's not an ideal situation but there's little if anything that the Department can do at this point in time.
>
> And we're also looking at a child here that's 16 years and 2 months old. And I share his concern about the 90[-]day issue. It's not as if we would drive her to the 90[-]day place this afternoon if the Department were to take her out of the mother's home, it would not be unusual that she would be housed in a motel or a hotel some place. I think at this juncture there's little if anything that the Department can do and termination is the appropriate result here and that's what I'm going to do.

Notably, nowhere in the court's reasoning did it determine that M.Z. could safely be returned to Mother's sole care. The juvenile court terminated its jurisdiction on August 25, 2023, finding that keeping the case open "is contrary to the best interests of [M.Z.]"

15

## C.  Opinion of the Appellate Court of Maryland

Following the closure of the CINA proceeding, Mother noted a timely appeal to the Appellate Court of Maryland on September 21, 2023.  Mother raised one issue before the Appellate Court: whether the trial court erred when it terminated jurisdiction over M.Z. *See In re M.Z.*, 2024 WL 833367, at *1.  The Department filed an appellee brief in opposition and a motion to dismiss the appeal.  In its motion, the Department argued that Mother was not an aggrieved party entitled to an appeal.  It maintained that the juvenile court's order terminating the CINA case – and restoring Mother's unfettered right to raise her child without State intervention – was a favorable judgment and not appealable.

The Appellate Court granted the Department's motion to dismiss the appeal, holding that "Mother's rights were not aggrieved in a way that entitle[d] her to appeal." *In re M.Z.*, 2024 WL 833367, at *6.  It reasoned that in granting the CINA petition, "the [lower] court originally interfered with Mother's fundamental right and granted partial guardianship to the Department because M.Z. displayed dangerous, self-destructive behavior[.]" *Id.*  The Appellate Court noted that a "parent's interest at a CINA proceeding is the unfettered right to raise [their] child." *Id.* at *5 (quoting *In re Blessen H.*, 163 Md. App. 1, 19 (2005), *aff'd*, 392 Md. 684 (2006)).  By closing the CINA case, the Mother's unfettered right to raise M.Z. was restored and she was not entitled to an appeal despite her request to keep the proceeding open. *See id.*  Thereafter, Mother filed a petition for writ of *certiorari* with this Court, which we granted. *See In re M.Z.*, 487 Md. 195 (2024).

16

# III

## STANDARD OF REVIEW

Whether a motion to dismiss an appeal was properly granted is a question of law we review de novo. *See Chavis v. Blibaum & Assocs., P.A.*, 476 Md. 534, 551 (2021). We therefore review the legal correctness of the ruling without deference. *See D.L. v. Sheppard Pratt Health Sys., Inc.*, 465 Md. 339, 350 (2019).

# IV

## DISCUSSION

The Appellate Court of Maryland dismissed Mother's appeal, holding that because her "unfettered right to raise M.Z. has been restored. . . . Mother's rights were not aggrieved in a way that entitle[s] her to appeal." *In re M.Z.*, 2024 WL833367, at *6. For the reasons explained below, we disagree with the intermediate appellate court and hold that Mother is aggrieved by the termination of M.Z.'s CINA case.

### *Mother is an "Aggrieved" Party Entitled to Appeal*

The Appellate Court was correct to observe that a party cannot appeal from a wholly favorable judgment because the party is not aggrieved by that judgment. *See Paolino v. McCormick & Co.*, 314 Md. 575, 579 (1989); *see also Adm'r, Motor Vehicle Admin. v. Vogt*, 267 Md. 660, 664 (1973) (explaining that, generally, a party cannot appeal from a judgment that is favorable to them). However, we disagree with the Appellate Court's conclusion that the final order of the juvenile court in this case was "wholly favorable" to Mother. Mother objected to the closure of the CINA case at the exceptions hearing, arguing that she was unable to keep M.Z. safe on her own. Further, Mother did not request the

17

termination of M.Z.'s CINA case. She requested the opposite—that the CINA case remain open and that M.Z. receive in-patient and higher levels of care. And she lost.

We have held that a party is not prevented "from challenging an aspect of a lower court judgment or order that results in the party receiving less than the full relief [they] sought below, even though the judgment or order is otherwise in accord with the relief the party requested." *Thompson v. State*, 395 Md. 240, 249 (2006). In *Thompson*, the defendant's petition for post-conviction DNA testing was granted, but certain conditions imposed by the court potentially limited his ability to use the DNA results in future legal proceedings. *Id.* at 248. We held that the defendant was "an aggrieved party" and could appeal the decision because he did not receive the full relief he sought. *Id.* at 249.

In *Mugford v. Mayor and City Council of Baltimore*, taxpayers sought to have a contract between Baltimore City and a local union declared void. 185 Md. 266, 268 (1945). The contract in question was declared invalid and the City of Baltimore was "permanently enjoined and restrained from carrying out the undertakings of said contract on April 8, 1944 and from making and carrying out any other agreement with the [local] [u]nion granting to such [u]nion and its members, preferential advantages of any character over other employees of the City of Baltimore." *Id.* at 269 (internal citation omitted). Despite the lower court ruling in their favor, the taxpayers appealed. *See id.* We held that the taxpayers who sought to have a contract between the City of Baltimore and the union declared invalid could pose an appellate challenge to the portion of the trial court's decree that expressly permitted voluntary collection of union dues by the City, even though the decree declared the contract invalid and otherwise enjoined the City and the union from

18

"carrying out the undertakings of [the] contract[.]" *Id.* at 266, 269, 271-72. We therefore permitted the taxpayers to appeal that portion of the judgment of the lower court that denied them relief. *Id.* at 269.

Applying similar principles here, even if Mother can be characterized as having "prevailed" in the juvenile court in the sense that she was given full custodial rights over M.Z., she is nevertheless an "aggrieved party" entitled to appeal because she did not obtain the full relief she sought.

*Reunification Is Not the Only Goal of a CINA Proceeding*

We further determine that the Appellate Court's conclusion that Mother was not "aggrieved" because her "unfettered right to raise M.Z." was restored fails to account for the broader statutory purpose of the CINA statute, which extends beyond parental rights to include the protection, safety, and welfare of the child. CJP Section 3-802(a) emphasizes that one of the core purposes of CINA proceedings is to "provide for the care, protection, safety, and mental and physical development of any child coming within the provisions of this subtitle[.]" *See also In re T.K.*, 480 Md. 122, 132 (2022) (the State's interest in child protection under CINA statutes is paramount and can override a parent's right to raise their child when the child's welfare is at risk).

Parents, guardians, and the State also have an interest in acting in the best interest of the child in a CINA proceeding. *See, e.g.*, *In re Najasha B.*, 409 Md. 20, 33 (2009) ("The broad policy of the CINA Subtitle is to ensure that juvenile courts (and local departments of social services) exercise authority to protect and advance a child's best interests when court intervention is required."); *In re T.K.*, 480 Md. at 132 (noting that a

19

CINA proceeding seeks to balance "the fundamental right of parents to raise their children with the State's obligation and prerogative to protect a child who requires court intervention for protection[]"). Sometimes acting in a child's best interest in a CINA proceeding involves keeping the proceeding open for continued oversight. *See In re O.P.*, 470 Md. 225, 271 (2020) (holding that a juvenile court may continue temporary shelter care if it has reasonable grounds to find the criteria in the statute governing shelter care for CINA are satisfied); *see also Koffley v. Koffley*, 160 Md. App. 633, 640-41 (2005) ("The context, which justifies the direct and continuing supervision of the court, is that, as part of the CINA finding, the court has determined that court intervention is required to protect the child's health, safety, and well-being." (quoting *Frase v. Barnhart*, 379 Md. 100, 120 (2003))). Thus, while it is true that parents have the right to raise their children, this right includes the ability to advocate for what they believe is in the best interest of their child in a CINA proceeding.

A determination that a parent cannot appeal the closure of a CINA case simply because she has been reunited with her child undermines a core purpose of the CINA statute to keep children safe. Affirming the Appellate Court's decision in this case would allow the termination of a CINA case over a parental objection to evade appellate review, based on the premise that parents are not "aggrieved" once their "unfettered right to raise" their child is restored. This outcome is not only unjust to a parent who properly seeks judicial relief but is then denied appellate review; it also risks serious consequences—such as forcing a concerned parent to accept the closure of a CINA case despite ongoing safety concerns for their child in the home.

20

In this case, Mother's interest in the CINA case was not merely restoration of her custodial rights, but also ensuring M.Z.'s safety, which she argues is directly threatened by the termination of the CINA case. Mother's appellate challenge to the termination of M.Z.'s CINA case is premised on the court's protective role in ensuring the safety of children. According to Mother, termination of the CINA case is not appropriate because the Department failed to demonstrate that the services available have been exhausted, are no longer required, or that M.Z.'s challenges cannot be further addressed by agency intervention. Despite the Department's intervention and the juvenile court's oversight, Mother contends that significant safety concerns remain. For example, after M.Z. was discharged from The Children's Home in February 2023, M.Z. continued to run away, physically assaulted her mother, engaged in substance abuse, expressed suicidal ideations, as well as made a suicide attempt. Mother argues that termination of the CINA case deprives M.Z. of the necessary protections and services that cannot be accessed elsewhere, and that M.Z.'s well-being is threatened as a result.

The Department does not dispute Mother's factual assertions concerning M.Z.'s conduct. Rather, it contends that it has done everything that it can for M.Z., making termination of the CINA case appropriate. In response to concerns regarding M.Z.'s violent outbursts and threats of suicide, the Department stated that it does not provide any services "to prevent a teenager from threatening physical harm to either herself or someone else." Whether the Department's assertions are true—that its efforts to keep M.Z. safe were reasonable and that Mother can meet M.Z.'s needs without continued court

21

oversight—was a point that Mother was permitted to challenge in the juvenile court and that she may continue to dispute on appeal.

## V

### CONCLUSION

We hold that a parent who objects to a final order of the juvenile court that terminates a CINA case may be an "aggrieved party" for purposes of appellate review if the parent has not obtained all relief they sought in the juvenile court. A parent's interest in a CINA proceeding is not limited to the fundamental right to raise their child, but rather extends to the safety, well-being, and development of their child. Accordingly, we vacate the judgment of the Appellate Court and remand this matter to the Appellate Court for further proceedings consistent with this opinion.

> **JUDGMENT OF THE APPELLATE COURT OF MARYLAND IS REVERSED. CASE REMANDED TO THE APPELLATE COURT OF MARYLAND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE APPELLATE COURT OF MARYLAND TO BE PAID BY RESPONDENT.**

22